Amy Robinson, Esq.
Symone Yancey, Esq.
GISKAN SOLOTAROFF & ANDERSON, LLP
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LESLIE KOHN, TARA MURPHY, NICOLE SINATRA, and KHIABET LEAL,<br><br>                    Plaintiffs,<br><br>     v.<br><br>THE CITY OF NEW YORK and WILLIAM BASSELL,<br><br>                  Defendants. | Civil Action No.:<br><br>**COMPLAINT**<br><br><br>**DEMAND FOR JURY TRIAL** |

## PRELIMINARY STATEMENT

This is a sexual assault and sexual harassment case brought by four brave women against their abuser, Principal William Bassell, and the deliberately indifferent municipal system that enabled him to terrorize them, the New York City Department of Education ("DOE"). For more than a decade, Bassell abused his power as Principal of the Academy of American Studies ("AAS" or the "Academy") to sexually harass, degrade, and assault female staff and students. He regularly groped women on their inner thighs and other intimate areas of the body, leered at women's breasts, made unwelcome, vulgar, and sexually charged comments to women, and sent them lascivious text messages. One of his victims was only 16 years old—a high school Junior—when Bassell groped her inner thigh.

While Bassell has been treating a New York City high school as his personal playground

for sexual fulfillment, he has enjoyed the robust protections of the DOE: When each of the four named Plaintiffs complained about Bassell to the various municipal offices in charge of monitoring the DOE, they were either stonewalled or intimidated into silence. Then, Bassell, protected by the City, retaliated against the women who complained about him using all available resources.

Finally, after being protected for decades, Bassell is now being held responsible for his reprehensible acts. In May 2025, Plaintiff Leslie Kohn courageously reported Bassell's unlawful behavior to the police, resulting in Bassell's arrest and ongoing prosecution for sex abuse and forcible touching. He is currently on leave from AAS, though he maintains the role of Principal.

The Plaintiffs in this action, Khiabet Leal, Nicole Sinatra (formerly Colon), Tara Murphy, and Ms. Kohn, are public school teachers, administrators, and guidance counselors who work for the DOE. They are dedicated public servants who have decided to come forward with their allegations after years—or even decades—of harassment and intimidation. Ms. Leal, Ms. Sinatra, Ms. Murphy, and Ms. Kohn seek accountability and justice for what Bassell forced them (and likely many other women) to endure. Their hope is that Bassell will never be able to abuse his power again.

Based on the information available to Plaintiffs, it is nearly certain that there are dozens of other women and girls who were abused by Bassell. However, because Bassell still holds the title of Principal, many of his victims are unwilling to come forward publicly for fear of retaliation. Until Bassell is truly held accountable for his actions, justice cannot be served.

## PARTIES

1.   Plaintiff Leslie Kohn is domiciled in Nassau County, New York.

2.   Plaintiff Tara Murphy is domiciled in Queens County, New York.

3.   Plaintiff Nicole Sinatra (formerly Nicole Colon) is domiciled in Queens County, New York.

4.   Plaintiff Khiabet Leal is domiciled in Queens County, New York.

5.   Defendant the City of New York (the "City") is a municipal corporation headquartered at 52 Chambers Street, New York, NY 10007.  Through the New York City Department of Education (the "DOE"), the City owns, maintains, and operates the Academy of American Studies ("AAS"), located in Long Island City at 40-11 28 Street, Queens, NY 11101.  The DOE is responsible for 1,866 public schools, which operate in all five boroughs of New York City and are attended by approximately 1.1 million New York City schoolchildren.

6.   At all times relevant hereto, Defendant City, acting through the DOE, was responsible for the policy, practice, supervision, implementation, and conduct of all DOE matters and for the appointment, training, supervision, and conduct of all DOE personnel.  In addition, at all times material herein, Defendant City was responsible for ensuring that its personnel obeyed the Constitution and laws of the United States and the State of New York.

7.   Defendant City, through the DOE, employs Defendant William Bassell as the Principal of the Academy of American Studies.

8.   Defendant William Bassell is a resident of New York.

9.   Defendant Bassell has served as Principal of the Academy of American Studies since 2011.  Prior to that, he served as Principal of Long Island City High School.

10. Defendant Bassell is one of the longest-serving Principals in the DOE.

11. Defendant Bassell is an employee of Defendant City and has been an employee of Defendant City for more than 40 years.

12. Additionally, Defendant Bassel has for years held a powerful position on the union representing Principals and Assistant Principals, the Council of School Supervisors and Administrators ("CSA").

13. At all times relevant, the City and the DOE were required to ensure the safety and security of the students at AAS.

14. At all times relevant, the City and the DOE had a duty and responsibility to ensure the safety and security of the students at AAS.

## JURISDICTION AND VENUE

15. This action arises under the Fourteenth Amendment to the United States Constitution, the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX"), the New State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq*. ("NYCHRL").

16. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331(a) and 1343(4).

17. This Court has supplemental jurisdiction over the State and City law claims based on 28 U.S.C. § 1367.

18. Venue is properly before this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District.

## BACKGROUND

I.    **PRINCIPAL BASSELL, PROTECTED BY THE DOE, HAS CREATED A CULTURE OF SEXUAL HARASSMENT AND RETALIATION AT THE ACADEMY OF AMERICAN STUDIES.**

19. William Bassell, the Principal of AAS for the last 14 years, has systematically leveraged his authority to sexually harass and abuse female students and faculty.  The DOE has been aware of Bassell's conduct since at least 2016, but it has exhibited deliberate indifference by failing to act and protect the women and girls at the Academy, thereby allowing a serial predator to use a New York City public school as a venue for grooming and sexual assault.

20. With the benefit of the DOE's deliberate indifference, Bassell—widely known as "Creepy Bill," "Creepy Bassell," or simply "Creep" by students and faculty members at the Academy—has, *for more than a decade*, targeted female employees and at least one female student, singling them out for illegal touching, texting, and commentary.

21. Bassell has engaged in a litany of sexually harassing acts, including:

- Stroking, rubbing and groping women on intimate parts of their bodies, including the inner thigh, feet, and neck, without their consent;

- Asking women about their private sex lives, including questions about their virginity and masturbation;

- Gossiping about the intimate details of his students' sex lives;

- Making lewd comments and "jokes" about ejaculation and oral sex; and

- Leering at women's bodies, especially their breasts and buttocks.

22. Bassell is known to favor young and attractive women for job openings at the Academy.  In fact, Bassell's penchant for hiring young, beautiful women was so well known

that faculty members referred to the all-female team of guidance counselors at AAS as Bassell's "Harem."

23. Bassell frequently made crude and sexual comments at work. For example, he casually revealed to a teacher that one of the Assistant Principals had "gotten so fat that her husband wouldn't fuck her." On another occasion, when one of the Guidance Counselors declined to participate in a group outing, Bassell said, "I can make her come, oh, I can make her cum." In yet another instance, Bassell told a group of female employees that "the only reason [student X] comes to school is because [student Y] sucks his dick."

24. Bassell's verbal harassment of women often turned physical. He frequently invaded the offices of Assistant Principals ("APs") and Guidance Counselors and touched their bodies in unsolicited, unwelcome, and sexually charged ways. During meetings, he frequently stroked women's arms or lower backs without their consent. Plaintiff Leslie Kohn was summoned to Bassell's office on multiple occasions under the pretense of reviewing work-related matters only for him to proceed to grope and rub her inner thigh without her consent.

25. Bassel endeavored to assert power and dominance over Plaintiffs in any way he could, even pressuring one of them—Plaintiff Tara Murphy—into buying his lunch on a regular basis.

26. Bassell also, of course, retaliated against the women who dared to report him or oppose his harassment. This retaliation ranged from threatening their jobs when they rejected his physical advances, as he did to Ms. Murphy, to cruelly and publicly berating them, as he did to Plaintiff Nicole Sinatra after she reported him to the DOE.

27. Shockingly, the DOE knew about Bassell's sexual harassment and abuse at least as early as 2016, when one brave 17-year-old student—Plaintiff Khiabet Leal—told multiple teachers and her guidance counselor, Plaintiff Nicole Sinatra, that Bassell had sexually assaulted her during a school field trip. Ms. Sinatra dutifully reported the incident directly to the DOE. Instead of protecting Ms. Leal, DOE investigators interrogated her, expressing derisive skepticism of her account, and made a thinly veiled threat about her prospects for college. The DOE failed to remedy the problem, allowing Bassell to remain in the same position of power, where he continued harassing and assaulting women at the Academy. Had the DOE acted in 2016, it could have prevented many women from sexual harassment.

28. In recent years, Ms. Kohn and Ms. Murphy attempted to report Bassell's inappropriate behavior, but the DOE continued its pattern and practice of protecting Bassell by discouraging women from making formal complaints. For example, in September 2022, a Title IX officer employed by the DOE told Ms. Kohn that reporting Bassell would be futile because he was "untouchable." In 2024, a union representative told Ms. Murphy that Bassell is "Teflon Don" because "nothing sticks to him." The union representative further warned that if Ms. Murphy reported Bassell for sexual harassment she would "go down swinging." With each failure to investigate an individual complaint and hold Bassell accountable for his actions, the DOE allowed Bassell to prey on other women and girls at the Academy.

## II.    KHIABET LEAL'S FACTUAL ALLEGATIONS.

### A.  Ms. Leal's Background.

29. Plaintiff Khiabet Leal is the embodiment of the American Dream. A daughter of immigrants, she grew up in Queens, NY, with limited resources and learning English as a second language.

30. Through hard work and perseverance, Ms. Leal has achieved notable success: she earned a B.A. in Elementary Education and Drama Theater, an M.A. in Education, and an M.S.Ed. in Integrated Bilingual Special Education, all from Queens College, City University of New York.

31. Ms. Leal is the first person in her family to attend and graduate college.

32. Since September 2021, Ms. Leal has worked as a public-school teacher in Queens. She has taught First Grade, Second Grade Integrated Co-Teaching ("ICT"), and Dance.

33. Ms. Leal's path to success was not easy. And it was almost derailed by Bassell.

34. In the fall of 2013, Ms. Leal enrolled in the Academy as a Sophomore in high school.

35. Ms. Leal had transferred to the Academy from another high school because she was severely bullied at her prior school. AAS administrators (including Bassell) were aware of the circumstances of Ms. Leal's transfer.

36. Bassell knew Ms. Leal had a history of being bullied and that she was vulnerable.

37. Starting during Ms. Leal's junior year, Bassell would sometimes summon her to his office for casual discussions. Bassell always seemed excited to see Ms. Leal and made her feel welcome. Ms. Leal, an ambitious and bright student who yearned to be the first person in her family to attend college, was honored to be given this type of special attention from her school's Principal.

38. Having a positive relationship with the school's Principal was important for Ms. Leal. She knew that cultivating strong relationships with teachers was one of the many steps to getting into a good college.

39. Ms. Leal admired Bassell.  She believed that he was someone she could trust.

**B. Bassell Sexually Assaults Ms. Leal.**

40. Bassell, in addition to serving as Principal, also teaches a class on Opera at AAS.

41. Ms. Leal enrolled in Bassell's Opera class.

42. As part of the Opera class, Bassell took his students to the Metropolitan Opera at Lincoln Center every year.

43. Ms. Leal's class attended the opera on Friday, February 13, 2015.  Ms. Leal was 16 years old at the time.  Bassell chaperoned the group.

44. Ms. Leal remembers the date of the opera because a friend had given her a small but memorable pre-Valentine's Day gift: a bag of hazelnut chocolates.  Ms. Leal remembers holding the gift bag in her hand while she watched the opera.

45. During the opera, Ms. Leal began to experience a migraine, a chronic health issue for her at the time.  Along with a sharp headache, Ms. Leal felt nauseated and had a stomachache.

46. At intermission, Ms. Leal stepped into the lobby to get some air.  Still feeling ill, she sat down on the red carpet in the lobby of the Metropolitan Opera House.

47. Bassell approached Ms. Leal and crouched down beside her.  He asked if she was all right.

48. Ms. Leal thought that Bassell was simply concerned about her illness and kindly checking in.  But then, Bassell, without saying a word, reached underneath Ms. Leal's skirt and placed his hand on Ms. Leal's inner, upper thigh, groping her and rubbing up and down her leg for several moments.  Bassell's hand was in direct contact with her skin on her inner thigh.

49. Ms. Leal froze.

50. Ms. Leal did not consent to this touching—nor could she, as she was a minor and a student at Bassell's school—and was shocked by Bassell's actions.

51. As soon as Ms. Leal mustered the strength, she stood up and walked away.  She stood next to other students from the Academy, where she hoped she would be safe.

52. The following week at school, Bassell treated Ms. Leal as if he had not sexually assaulted her.  He did not appear contrite or embarrassed by his behavior.

53. Thereafter, Bassell continued his practice of summoning Ms. Leal to his office in the middle of class, giving no explanation to her teachers.  During some of these trips to Bassell's office, he offered to write a letter of recommendation for Ms. Leal for college.

**C.  After Ms. Leal Reports Bassell, DOE Investigators Intimidate her into Silence.**

54. During the 2015-2016 school year, when Ms. Leal was a Senior at the Academy, she told two trusted teachers about Bassell's sexual assault.

55. Ms. Leal believes she spoke with these teachers in early 2016.  She cannot recall the exact month or day.

56. The teachers then disclosed Ms. Leal's account to a guidance counselor, Plaintiff Nicole Sinatra.  Ms. Leal met with Ms. Sinatra separately and disclosed Bassell's sexual harassment at the opera.

57. A few days or weeks later, Ms. Leal was abruptly summoned away from class.  A group of three or four adults, all dressed in dark suits and holding clipboards, escorted her out of class and into an empty classroom.  To the best of Ms. Leal's recollection, the adults did not disclose their names, where they were from, or why they were at her school.

58. As Ms. Leal waited in an empty classroom, alone, she could hear and see the

investigators speaking to Bassell just outside the room.  At that point she began to put the pieces together; she assumed the suit-wearing adults were investigating her allegations against Bassell.

59. The investigators eventually entered the classroom and explained that they were investigating Ms. Leal's claim that Bassell had touched her inappropriately on February 13, 2015.

60. The nameless interviewers did not provide business cards or write down their names or phone numbers for Ms. Leal.  They did not ask Ms. Leal if she wanted an adult, such as a parent or teacher, present for the interrogation.  (In fact, Ms. Leal believes the DOE did not inform her parents that she was being interrogated.)  The nameless investigators simply proceeded to interview Ms. Leal, a teenaged daughter of immigrants accusing the school principal of assault, with no protections in place.

61. The investigators asked Ms. Leal to provide a statement about exactly what Bassell had done to her.

62. Ms. Leal truthfully described how Bassell had groped and stroked her upper, inner thigh without her consent or permission while she sat on the floor of the opera house, feeling unwell.  The investigators took handwritten notes.

63. The investigators repeatedly questioned Ms. Leal's account.  They treated her with skepticism.  Ms. Leal recalls the investigators asking, "are you sure he touched you like that? Are you *sure* he did that?"

64. Ms. Leal also recalls the investigators saying, "Isn't he writing you a recommendation letter for college?"  This question invoked great fear in Ms. Leal, as her lifelong goal was to attend college and she did not want to do anything to jeopardize her

prospects.

65. The interview left Ms. Leal feeling confused, hurt, and scared that she had done the wrong thing by coming forward about Bassell's unwanted groping.

66. Ms. Leal never heard anything further from the investigators. Bassell continued to serve as Principal of the Academy.

67. Ms. Leal, feeling isolated and scared, did all she could to forget about Bassell's assault. She focused exclusively on her studies and enrolling in college.

68. For the next nine years, Ms. Leal did her best not to think about Bassell or the incident at the Metropolitan Opera. But despite her best efforts to block the assault out of her mind, it haunted her psychologically: she found herself unable to trust men and has struggled to be intimate with men. Ms. Leal attributes this to having been sexually assaulted by a man she trusted, a man more than 40 years older than she.

69. On May 29, 2025, Ms. Leal learned that Bassell had been arrested by the New York Police Department and charged with forcible touching and assault by the Queens County District Attorney's Office.

70. Ms. Leal was horrified to learn that the complaining witnesses were faculty members at the Academy.

71. Former teachers of Ms. Leal's began to contact her. They shared the news about Bassell's arrest and expressed deep regret for not doing more to protect her when she was in high school.

72. The news of Bassell's arrest and prosecution was jarring to Ms. Leal. Although she knew that what Bassell had done to her was wrong, she had not previously known that other women had also been subjected to his forcible touching.

73. Even more shocking to Ms. Leal was learning for the first time that numerous AAS teachers had been aware that Bassell had preyed upon her.

74. A message from one former teacher stated: "I always think about you and how the DOE turned its back on what happened."

75. Another teacher wrote that Bassell's arrest had made them think about "how nothing was done to protect [Ms. Leal] or any other student."

76. Prior to May 29, 2025, Ms. Leal had been unaware that the DOE had failed to protect her from a predator.

77. May 29, 2025, was the first time Ms. Leal became aware that the abuse she had endured—and the DOE's failure to protect her from Bassell—had not been an isolated incident but rather, was part of a pattern and practice of constitutional violations by Bassell and the DOE.

## III.    NICOLE SINATRA'S FACTUAL ALLEGATIONS.

### A.  Decades of Dedication: Ms. Sinatra's Work as a NYC Guidance Counselor

78. Ms. Sinatra has worked as a school guidance counselor in the New York City public school system since 1997, guiding and supporting thousands of students in their most formative years.  Backed by a master's degree in School Counseling from Brooklyn College and a certification as a secondary and elementary school counselor, Ms. Sinatra has dedicated her career to public service.

79. Ms. Sinatra began working at the Academy in January 2000.

80. At the end of the 2011-2012 school year, Bassell wrote Ms. Sinatra a handwritten note thanking her for her contributions to the school.  Bassell wrote her another handwritten note of appreciation at the end of the 2013-2014 school year.

81. Prior to the 2016 school year, when Ms. Sinatra reported Bassell for sexually abusing a minor, Ms. Sinatra's professional relationship with Bassell was cordial and without incident–he was appreciative of her hard work and never raised concerns about her performance.

**B.  Ms. Sinatra Reports Bassell for Sexually Abusing Ms. Leal.**

82. During the 2015-2016 school year, two Academy teachers approached Ms. Sinatra and informed her that Khiabet Leal, a senior at the Academy, had accused Bassell of inappropriately touching her during a school trip he chaperoned to Lincoln Center.

83. Ms. Sinatra met with Ms. Leal soon thereafter.  Ms. Sinatra believes this meeting took place in early 2016.

84. Ms. Leal confided in Ms. Sinatra about the incident, describing how Bassell had preyed upon her at the opera when she was feeling ill and had groped and rubbed his hand along her inner thigh without her consent.

85. Ms. Sinatra was shocked to hear about Bassell's abusive behavior, especially towards a minor student.

86. Ms. Sinatra recalled having seen Ms. Leal sitting in Bassell's office multiple times in the months prior.  She found it strange that Bassell would call Ms. Leal out of class so frequently.

87. After Ms. Leal's disclosure about Bassell's treatment of her at the opera, Ms. Sinatra acted swiftly to report the incident.

88. First, Ms. Sinatra reported Ms. Leal's allegation to two of the Academy's United Federation of Teachers ("UFT") Union Representatives,[1] both of whom advised her to report the incident directly to the DOE.

89. One of the union representatives told Ms. Sinatra that it was possible Bassell would find out that she had reported him and could learn her identity.

90. Ms. Sinatra was frightened and intimidated to learn that Bassell could learn that she was a whistleblower. Even though her own relationship with Bassell had always been cordial, she was aware he yielded power and influence within the DOE. She therefore understood that reporting Bassell could jeopardize her career.

91. Despite her fears, Ms. Sinatra bravely traveled to the DOE office that the union representatives directed her to.

92. At the DOE office, Ms. Sinatra spoke with a group of investigators and gave her account of what Ms. Leal had reported to her.

93. After leaving the DOE that day, Ms. Sinatra never heard from them about this issue again. The DOE investigators never followed up to gather more information, to discuss next steps, or to update Ms. Sinatra about their investigation.

94. Bassell continued to serve as Principal with no apparent diminution to his power or authority.

---

[1]  The UFT is the union that represents teachers and faculty members employed by the DOE. The Chapter Leader is a DOE employee who works for the school and serves as the liaison between a school's unionized members and the UFT.

**C.  Bassell Retaliates Against Ms. Sinatra for Reporting him to the DOE.**

95. Ms. Sinatra's worst fears about Bassell were soon borne out.  Soon after Ms. Sinatra spoke with DOE investigators and reported Bassell for inappropriately touching Ms. Leal, Bassell began to retaliate against Ms. Sinatra.

96. For more than 15 years, Bassell had been polite and cordial when he interacted with Ms. Sinatra.

97. Suddenly, in 2016, soon after Ms. Sinatra reported Bassell to the DOE, Bassell began to constantly criticize her work, the same work he had been entirely satisfied with just a few weeks prior.

98. Bassell began to speak condescendingly toward Ms. Sinatra.  He made sarcastic comments, raised his voice, blamed her for problems she did not cause, and berated her until she cried.  Bassell had not engaged in any of these behaviors toward Ms. Sinatra prior to 2016.

99. For example, when a student was having trouble arriving to school on time for an early morning course she needed to graduate, Ms. Sinatra approached Bassell about switching the student to a later time slot.  Rather than acknowledging Ms. Sinatra's efforts, Bassell screamed at Ms. Sinatra, blaming her and repeatedly saying, "it's your fault isn't it? Isn't it?"  Even when Ms. Sinatra began to cry and tremble, Bassell continued to scream at her.

100.    In another instance, Bassell yelled at Ms. Sinatra for using the bathroom too frequently and told her that one of her coworkers had "reported" her.  (The coworker later denied that she had reported Ms. Sinatra for anything, yet alone something as trivial as using the bathroom.)

101.    Ms. Sinatra came to fear interactions with Bassell so much that she began asking colleagues to accompany her when she needed to speak with him.

102.    Bassell's abusive and retaliatory behavior eventually caused Ms. Sinatra to develop extreme anxiety.

103.    Ms. Sinatra's anxiety made it difficult for her to sleep at night. She often slept poorly or not at all, which caused her to feel exhausted almost every morning.

104.    In addition, Ms. Sinatra's fear of facing Bassell caused her to have frequent panic attacks.

105.    As a result, Ms. Sinatra sometimes arrived approximately 5-7 minutes late to work. She was rarely more than a few minutes late, and she always made up any time she missed by working late, often well past her official end time. Because Ms. Sinatra is not a classroom teacher, her very minor tardiness did not have a negative impact on the Academy's students.

106.    Moreover, Ms. Sinatra was diligent about calling her office when she was running late and explained that she had a medical issue.

107.    Despite being aware that Ms. Sinatra had a medical issue, Bassell berated her for her tardiness and wrote her up for being late at every possible opportunity.

108.    Upon information and belief, other Academy employees also sometimes arrived late for work, but Bassell did not berate them or write them up for tardiness. He specifically targeted Ms. Sinatra.

109.    In November of 2018, after receiving multiple write-ups for her tardiness, Ms. Sinatra procured a note from her doctor, which stated that, because her diagnosed anxiety peaks in the early morning hours, she required a more flexible work schedule during

that time.  Ms. Sinatra provided this note to the payroll secretary and to her direct supervisor, the AP of the Guidance Department and Organization.  She also provided updated doctors' notes in October 2019 and October 2023.

110.    Bassell refused to acknowledge Ms. Sinatra's request for a reasonable accommodation for her disability and continued to write her up for tardiness, even if Ms. Sinatra arrived just one minute late.

111.    Upon information and belief, Bassell did not punish other faculty members who arrived late at work.  Bassell mistreated Ms. Sinatra because he knew she had reported him to the DOE.

112.    In or around May 2023, Bassell called Ms. Sinatra into his office to, once against, berate her for tardiness.  On this occasion, she reminded him that she had a diagnosed medical condition which often made it difficult for her to arrive to work on time. Bassell yelled: "I don't care about your medical condition!"

113.    Ms. Sinatra's colleagues, unlike Bassell, respect her and expressed appreciation for her hard work.  For instance, on February 16, 2024, the Academy's AP of the Guidance Department wrote Ms. Sinatra a letter thanking her for providing supportive care to a student in crisis outside of her contractual work hours.  The letter praised Ms. Sinatra's "consistent efforts to prioritize the well-being of the student, while ensuring all protocols were followed meticulously."

114.    In another letter dated January 6, 2025, the AP of the Guidance Department expressed gratitude to Ms. Sinatra for the "dedication and the effort [she] put into [her] work every day."

115.     Bassell's retaliatory actions towards Ms. Sinatra continued relentlessly until his arrest in May 2025.

## IV.    TARA MURPHY'S FACTUAL ALLEGATIONS.

### A.    Bassell Starts Making Sexual Comments to Ms. Murphy Within Weeks of her Start Date.

116.     Tara Murphy, a Licensed Social Worker ("LSW") was hired as a school Social Worker at the Academy in late June of 2021, immediately following graduation from her master's degree program. It was her first job. At the time, she was 25 years old.

117.     Ms. Murphy was inspired to become a social worker because of the difficulties she faced in her own childhood; she wanted to support students encountering similar challenges and remind them that they were not alone.

118.     Within a few weeks of Ms. Murphy's start date at AAS, Bassell began making inappropriate, sexual comments to her.

119.     For example, in October 2021, during a meeting with Ms. Murphy and another co-worker, Bassell asked Ms. Murphy about her Halloween costume and how much skin she planned to show. Ms. Murphy quickly changed the subject, but Bassell continued to ask similar questions every year around Halloween.

120.     Bassell also made multiple inappropriate and unwanted sexual comments about Ms. Murphy's then-fiancé (now husband), saying "he's not good for you, you should be with a real man." At one point, Bassell, unsolicited, pressed his cheek against Ms. Murphy's face and whispered into her ear, "you deserve a husband who will clean and cook for you."

121.     Bassell touched Ms. Murphy inappropriately as well. In the mornings, on the way to his office, Bassell frequently cornered Ms. Murphy in the hallway, pressing his

body close to hers and sometimes rubbing her arms or upper back.  Bassell also gave Ms. Murphy long, lingering hugs while rubbing her back whenever he thought she seemed sad or if he had good news for her.

122.    Additionally, whenever Ms. Murphy wore a dress to work, Bassell would leer at her, especially when she bent over.  Multiple students noticed Bassell's inappropriate staring and warned Ms. Murphy.  Ms. Murphy was mortified, but in an effort to shield her students from the awful truth, dismissed their concerns and made excuses for Bassell.

123.    Ms. Murphy began to notice that Bassell was disturbingly preoccupied with the sex lives of his underage charges.  Bassell took particular interest in certain female students and routinely pressured Ms. Murphy to disclose details about these girls' intimate and sexual encounters.

124.    As the school's Social Worker, Ms. Murphy's job entailed speaking with students about sensitive situations, such as abuse or mental health issues.  She was thus privy to confidential and private student information.  Bassell frequently and inappropriately asked Ms. Murphy questions about the sex lives of certain students.  Ms. Murphy, horrified, once cautioned Bassell that his behavior could run afoul of certain confidentiality laws, but he dismissed this concern, stating that he had the authority to ask these questions as a "school leader."

125.    Bassell often gossiped to Ms. Murphy and her colleagues about the sex lives of students, once telling Ms. Murphy that a particular female student had agreed that she would "suck [male student's] dick."  Ms. Murphy was appalled and offended by Bassell's conduct.

126.    On another occasion, in the spring of 2022, Bassell told Ms. Murphy that

he believed a female student had performed a sexual act in a coffeeshop bathroom. Bassell then asked Ms. Murphy about her own sexual experiences as a teenager and whether she had ever had sex in a location other than a bed.

127.    Ms. Murphy changed the subject and refused to answer these questions, but Bassell continued to badger her for an answer over the next few months.

**B. Ms. Murphy's Complaints Fall on Deaf Ears.**

128.    In April 2022, Ms. Murphy contacted one of the Academy's UFT Chapter Leaders, and reported Bassell's inappropriate sexual behavior towards herself, as well as his inappropriate interest in the personal lives of AAS students.

129.    The UFT Chapter Leader agreed that Bassell's conduct was "messed up," and said that many other women had complained about Bassell as well. The UFT Chapter Leader discouraged Ms. Murphy from making a formal complaint against Bassell, cautioning that it "wouldn't go anywhere" and that Ms. Murphy should be prepared for a backlash. The UFT Chapter Leader never informed Ms. Murphy that she could make an anonymous complaint; never informed Ms. Murphy about the DOE's strict no-retaliation policy; never told Ms. Murphy that whistleblowers are protected under the law; and never told Ms. Murphy that if she believes she is being retaliated against for complaining, then she should report such retaliation to the DOE.

130.    Without the support of her union, Ms. Murphy did her best to create boundaries between herself and Bassell. For example, when Bassell attempted to give Ms. Murphy long hugs or a rub her back, which were unwelcome and non-consensual, Ms. Murphy would become stiff like a board rather than hugging him back. If Bassell was in Ms. Murphy's office and approached her physically, Ms. Murphy would open her desk drawer to

create a physical barrier between them, though he would often just shut the desk drawer again and continue moving closer to her.  And when Bassell talked about sex or made sexual comments, Ms. Murphy would redirect the conversation or remind him that he was the same age as her father.

131.    Another strategy Ms. Murphy employed to avoid any potential 1:1 interactions with Bassell (in order to protect herself from unwanted touching or sexual comments) was to overbook her schedule with counseling sessions.  For 3 years, Ms. Murphy made sure she had a student in her office for counseling almost every single period of the school day.  Ms. Murphy forwent her lunch breaks nearly every day for three years in order to avoid Bassell.

### C.  Bassell Retaliates Against Ms. Murphy.

132.    When Ms. Murphy refused to reciprocate Bassell's unwanted sexual advances, he retaliated against her.  Initially, Bassell would simply roll his eyes and glare at Ms. Murphy with a huff when she refused to hug him or flirt with him, but as she continued to rebuff Bassell, the retaliation escalated.  Bassell began spreading false rumors that Ms. Murphy was not doing her job properly.  Ms. Murphy once overheard Bassell maliciously state, "I don't think we are going to move forward with tenure with Tara.  Tara is immature."[2]

133.    Bassell's statements were demonstrably untrue: Ms. Murphy always received the highest possible scores on her performance reviews.

134.    A number of Ms. Murphy's colleagues urged her to flirt with Bassell in

---

[2] "Tenure" is a legal status that a public-school employee can obtain after remaining successfully employed at a school for a given number of years. Tenure provides considerable job protections, like making it more difficult to be dismissed without proper cause and due process.

order to achieve tenure.  Ms. Murphy refused.

135.    In addition to spreading false rumors about Ms. Murphy, Bassell also retaliated by outright ignoring Ms. Murphy's work-related requests, thus making it difficult for Ms. Murphy to carry out the duties of her job.  For example, when Ms. Murphy required Bassell's approval to attend a DOE-sponsored event during work hours, which would count as a necessary continuing education credit for her LSW Credential, he ignored her emails and, when she approached him in the hallway, said he didn't have time to talk with her.  This caused Ms. Murphy to miss out on this free opportunity, meaning she had to pay for an extra continuing education credit later.

136.    Bassell failed to demonstrate basic professionalism toward Ms. Murphy. For example, to receive tenure, Ms. Murphy was required to be observed during a counseling session with a student.  Ms. Murphy attempted to schedule Bassell's observation in advance so that she could obtain the student's permission to have him attend the session.  Instead, Bassell showed up unannounced to a session with a female student who did not want him there (and whose sex life he had taken a lurid interest in).

137.    Ms. Murphy was afraid to report any of Bassell's retaliation for fear that she could lose her employment at the Academy as Bassell frequently made clear that Ms. Murphy was lucky to have her position because the DOE did not hire many social workers at the time.  Bassell would gratuitously and cruelly tell Ms. Murphy that "a school can't function without teachers, but it can function without a social worker and guidance counselors."  Ms. Murphy believes that Bassell said this in order to stoke fear in her about job instability and in an attempt to make her express gratitude to Bassell for employing her. It was obvious to Ms. Murphy that this was yet another mind-game that Bassell played.

138.     Ms. Murphy had been hired pursuant to a grant allocated to schools by the Biden administration to ensure they had adequate funds for mental health and substance abuse services—but it only provided enough funding for three years. Accordingly, Bassell often reminded Ms. Murphy that she was on a "countdown" until her "Biden Money" was gone.

139.     In March 2024, during a department meeting attended by a number of other staff members of the Guidance Department, including Plaintiff Nicole Sinatra, Bassell suggested ordering Chinese food. He then walked up behind Ms. Murphy, leaned over her shoulder and began rubbing her back, repeatedly touching the band of her bra. Bassell's touching was unwelcome and unwanted.

140.     As Bassell inappropriately rubbed Ms. Murphy's back, he brought his lips up to her ear and said that he wanted to order "suck me yum soup" from the Chinese restaurant. He then repeated the offensive phrase "suck me yum, suck me yum" *many times* directly into Ms. Murphy ear while he laughed.

141.     Ms. Murphy froze, terrified and disgusted by Bassell's behavior. She could feel his lips on her ear as he repeated "suck me yum," and it caused her to panic. First, Ms. Murphy experienced a tingling sensation, like pins and needles, from head to toe. Then, she began shaking and felt extremely cold.

142.     A co-worker, noticing that Ms. Murphy was in a state of distress, came to her aid by distracting Bassell. Ms. Murphy then fled to her office where she quickly closed her window, locked the door, and sat on the floor, hyperventilating and sobbing. She tried to not to cry loudly enough for anyone to hear.

143.     Within a few days, Ms. Murphy, along with Ms. Sinatra and other faculty

members who were present at the meeting, reported the incident to the same UFT Chapter Leader Ms. Murphy had spoken to before.

144.    The UFT Chapter Leader informed Ms. Murphy and the other women that this was not the first report against Bassell.  She then stated in a matter-of-fact manner that Bassell was "Teflon Don" because "nothing sticks to him."  She told Ms. Murphy that if she reported the incident, it would come down to a battle, but "at least [she would] go down swinging."

145.    Ms. Murphy, terrified of being denied tenure and having Bassell derail her promising career, did not file a formal complaint.  She then experienced the same symptoms from the day before: her body shook, she felt cold, and she couldn't speak.  Her companions protested, telling the UFT Chapter Leader that the situation was grossly unfair.  Disheartened, they left the meeting with the UFT.

146.    Bassell's harassment, and the DOE's cover-up of it, had a deeply adverse impact on Ms. Murphy's emotional state.  Ms. Murphy is a survivor of sexual abuse and struggled with an eating disorder as a teenager.  Bassell's unwanted touching triggered memories of the sexual abuse she experienced as a child and reignited her past struggles with her eating disorder, thus retraumatizing Ms. Murphy.

## V.    LESLIE KOHN'S FACTUAL ALLEGATIONS.

### A.  Bassell Begins Sexually Harassing Ms. Kohn Before her Official Start Date.

147.    In or around early June 2022, Ms. Kohn was hired as the Interim/Acting AP of Special Education and Arts at the Academy.[3]

---

[3] Interim/Acting ("I/A") is an appointment within the DOE with the potential to become permanent if certain conditions and expectations are met.  I/A positions are inherently insecure, as the school's principal has the authority to terminate I/A employees at any time for any reason.

148.    Ms. Kohn is a highly accomplished public servant with more than 15 years of experience as an educator.  She holds a master's degree in Educational Theater and English from New York University and is certified as a School Building Leader, School District Leader, and in multiple instructional areas, including English, Theater, Music, and Students with Disabilities.

149.    Prior to joining the Academy in 2022, Ms. Kohn was a tenured educator at the Scholars' Academy, a New York City public school in Rockaway Park, Queens, where she served for a decade as Director of Theater Arts and taught English and Special Education to students in Grades 6–12.

150.    During her time as a teacher, Ms. Kohn has cultivated a reputation for consistently going above and beyond to support her students.  For example, at the Scholars' Academy, she established a Theater and Arts Department for Grades 6-12 and secured a six-figure grant from the DOE's Office of Arts and Special Projects to enhance school facilities.

151.    Ms. Kohn's first day of official work at the Academy was August 29, 2022.  However, between June 2022 and August 29, 2022, Bassell directed Ms. Kohn to work approximately twenty-four hours per week without pay in preparation for the upcoming school year.

152.    Bassell began behaving inappropriately toward Ms. Kohn almost immediately after she accepted the job offer.  For example, on June 6, 2022, when Ms. Kohn arrived at Bassell's office for a scheduled 1:1 meeting, Bassell subjected Ms. Kohn to a prolonged and inappropriate hug that caused her to feel violated and deeply uncomfortable. Then, after Ms. Kohn sat down next to him at his desk, Bassell stroked her arm without her permission. Ms. Kohn was shocked by his behavior and hoped it would not continue.

153.    On June 25, 2022, Bassell, Ms. Kohn's new supervisor, sent her a series of inappropriate text messages pressuring her to provide photographs of herself, including: "Would love to see that outfit!!," "send a photo later!," "send a photo" and "You still owe me a photo."  Feeling compelled to comply with her superior's demands, Ms. Kohn reluctantly sent a picture of herself dressed in formal attire.  On July 1, 2022, Bassell further texted Ms. Kohn, comparing her to a parent of an AAS student and adding, "You are much better looking. And sexier, too, if I can say that."  In response, Ms. Kohn sent a stop sign emoji in an effort to shut down the conversation.

154.    The following week, on July 7, 2022, during another 1:1 meeting in Bassell's office, Bassell again stroked Ms. Kohn's arm without her permission, while she sat next to him at his desk.  During a phone conversation shortly thereafter, Bassell shockingly asked, "When was the last time you were with your husband?"  Ms. Kohn refused to answer this unwelcome and harassing question.

155.    Despite feeling extremely uncomfortable with and disturbed by Bassell's behavior, Ms. Kohn refrained from confronting him for fear that it would affect her new position at the Academy.  Becoming an Assistant Principal was an important step in Ms. Kohn's career as she aspired (and still aspires) to become a Principal one day and obtain her doctorate in educational leadership.

156.    Throughout the rest of the summer, Bassell sent Ms. Kohn a number of text messages requesting that she work in person with him.  However, Ms. Kohn always declined, preferring to work from home in order to avoid face-to-face contact with Bassell.

157.    Bassell also sent Ms. Kohn a barrage of inappropriate text messages, including repeated requests such as "May I send you a virtual hug and kiss," as well as

statements like "You belong to me."  Ms. Kohn rejected his advances and reiterated that she wished to maintain a professional relationship.

158.    At Bassell's request, Ms. Kohn continued to perform work-related tasks throughout the summer without compensation, including parent outreach, phone calls to other schools and DOE professionals, amending students' Individual Educational Plans ("IEPs"), addressing programming concerns, and managing complex student and parent issues.

159.    On August 29, 2022, Ms. Kohn's first official day of work according to DOE records and her paystubs, she was required to return to work in person.  That day, Bassell entered her office, placed his hand on the right side of her neck, and stroked it while saying, "I came to bother you."  Ms. Kohn immediately protested, asking him not to touch her, but Bassell ignored her.  Bassell, still stroking her neck, replied, "I don't mind."  Ms. Kohn then repeated: "Please don't touch me, I'm sweating," in an effort to stop the contact. Horrified by this overt act of sexual assault, Ms. Kohn immediately documented the unwanted physical contact in the spreadsheet she had been keeping to chronicle Bassell's inappropriate behavior. She was left feeling violated, shaken, and sickened.

160.    Bassell's sexual misconduct only escalated from that point.  During meetings in the conference room, sometimes 1:1 and other times with co-workers present, Bassell would frequently sit uncomfortably close to Ms. Kohn and stroke her arms without her consent or permission.  This touching, which was always unwelcome, inappropriate, and served no purpose other than Bassell's sexual fulfillment, occurred dozens of times during the course of Ms. Kohn's employment with the Academy.

161.    On many occasions during Ms. Kohn's tenure at the Academy (at least

10), Bassell summoned her to his office and asked her to sit next to him so that he could allegedly show her something on his computer.  During their conversations, Bassell would put his hand on her legs and grope her inner thighs.  Bassell did this, unsolicited, without Ms. Kohn's permission or consent.  Ms. Kohn was mortified, scared, disgusted, and angry about these unwanted physical touches.

162.    While Bassell sexually harassed Ms. Kohn, he never verbally acknowledged what he was doing; he just continued to speak to Ms. Kohn about school affairs as if the circumstances were completely normal.  Ms. Kohn never wanted Bassell to touch her, but she feared speaking up against him because, as an I/A AP without tenure, Bassell had the power to terminate her employment at will.

163.    Whenever Ms. Kohn pulled her arms or legs away from Bassell to indicate that she was uncomfortable and that he should stop touching her, Bassell simply ignored Ms. Kohn's rejections and persisted in placing his hands on her body without her consent.

164.    Bassell also regularly commented on Ms. Kohn's physical appearance, telling her she was beautiful or stunning and also regularly remarked on her clothing.

165.    Bassell's text messages to Ms. Kohn—which were relentless in their frequency—ranged from inappropriate to pornographic.

166.    For example, on October 16, 2022, Bassell sent Ms. Kohn a series of sexually explicit text messages, asking whether she preferred "toy[s] or fingers or both?" He then directly asked Ms. Kohn how old she was when she lost her virginity, and remarked, "I imagine you take time." Ms. Kohn rebuffed these advances, making clear that she wished to maintain a professional boundary and stating that she would "never discuss private moments."

**B.  Ms. Kohn Complains to the DOE Title IX Office, Which Fails to Protect Her.**

167.    On August 31, 2022, Ms. Kohn reached out to a former AP from her previous school—now serving in a different role within the DOE—regarding Bassell's unwelcome sexual advances and harassing behavior.  The former colleague informed Ms. Kohn that Bassell had a history of sexual harassment and advised her to report his conduct to the DOE's Title IX Liaison[4] or the Queens North Superintendent's Office.

168.    Ms. Kohn quickly followed this advice and contacted the DOE's Title IX Attorney covering Queens County to report Bassell's harassing behavior.

169.    The Title IX Attorney, whose name Ms. Kohn does not recall, informed Ms. Kohn that she could file a complaint about Bassell's behavior with the DOE's Office of Equal Opportunity ("OEO").  The Title IX Attorney implied that Ms. Kohn's identity as a whistleblower would be revealed to Bassell if she chose to file a complaint.  The Title IX Attorney failed to inform Ms. Kohn that her complaint would be kept confidential; that the DOE maintains a strict no retaliation policy; that whistleblowers, like herself, are protected by law; and that if, in the future, she came to believe she was being subjected to retaliation, she should call back and report such retaliation.

170.    Ms. Kohn, terrified that Bassell would retaliate against her given his decades of experience at the DOE and his many connections within the agency, and unaware of the protections that whistleblowers are entitled to under law, did not file a formal complaint that day.  Additionally, Bassell repeatedly asserted to Ms. Kohn that he was her union representative on the Council of School Supervisors and Administrators and instructed

---

[4] The DOE's Title IX Liaisons are assigned to specific DOE districts and tasked with ensuring compliance with Title IX in their specific regions through implementing investigative procedures consistent with federal legislation and conducting investigations of Title IX complaints.

her that if she ever had "any issues with me, you should come to me."

171.    In or around early December 2022, Ms. Kohn became a permanent AP at the Academy.  Even though Ms. Kohn no longer had I/A status, she still lacked tenure and the employment protections that come along with it.

172.    In or around mid-December 2022, Ms. Kohn confided in two of her co-workers, another AP and a Special Education teacher, about Bassell's harassment.  During both of these conversations, Ms. Kohn broke down in tears.  She had been holding back her pain, fear, and shame for months.  Both women were extremely empathetic towards Ms. Kohn's situation.  One of them even offered to sit in between Ms. Kohn and Bassell during meetings in order to create a physical barrier and to protect Ms. Kohn.

173.    Soon after Ms. Kohn disclosed this confidential information, Bassell entered Ms. Kohn's office and knowingly asked: "Are we okay?"  Ms. Kohn, concerned about upsetting Bassell and losing her position at the Academy, felt compelled to pretend there was nothing wrong.

174.    After this interaction, Bassell's behavior temporarily improved; he paused his weekly touching of Ms. Kohn's body and his inappropriate comments and text messages.  Ms. Kohn was relieved.

175.    In or around April of 2023, Mr. Bassel resumed his unwanted and unwelcome touching of Ms. Kohn on a regular basis.

176.    Every week from April 2023 through June 2024, Bassell groped, stroked, caressed, or otherwise touched Ms. Kohn's body, including intimidate body parts such as her inner thigh, without her consent or permission.

177.    Ms. Kohn was mortified and angry but also felt unable to make him stop.

178.    On or around July 10, 2024, after Bassell once again groped Ms. Kohn's inner thighs while she was working, she reached a breaking point.

179.    As a result of Bassell's ongoing harassment in the workplace, Ms. Kohn's mental and physical health deteriorated significantly. Beginning in April 2023, she sought weekly therapy to cope with the trauma. She suffered from severe anxiety and depression that manifested in abdominal pain, frequent shaking, excessive sweating, and persistent rumination over the situation and how she might resolve it. Ultimately, Ms. Kohn was prescribed psychiatric medication to regulate her emotions.

180.    On July 10, 2024, after Bassell once again groped Ms. Kohn's inner thighs while learning payroll at his computer, she reached a breaking point.

181.    During the summer of 2024, Ms. Kohn realized that the prospect of enduring regular unwanted groping for another school year was untenable. Ms. Kohn's physical and mental health simply could not withstand another year of Bassell's touching, texting, and sexual comments.

182.    Faced with no other choice, Ms. Kohn was forced to leave the position she had worked toward for years. She was also devastated to say goodbye to her many cherished colleagues and wonderful students she cared for deeply. When news of her departure spread, teachers sent messages such as, "Thank you for being the best AP I have ever had in my teaching career," "I will sincerely miss you. You have been one of the best bosses I have ever had (and I've had many)," and "I can't thank you enough for the work you've done for my growth." Others wrote, "I am so sad to see you go." Multiple teachers also wrote cards, and one gifted her a plaque that read "Difference Maker."

183.    Ms. Kohn accepted a non-administrative teaching position at a non-DOE

public school in Long Island where she earned nearly $50,000 less annually than she earned as an AP at the Academy.

184.    In accepting the non-DOE position, Ms. Kohn abandoned a steadily moving career trajectory with increased earnings and a respectable pension, but she was desperate to escape Bassell.

185.    On August 28, 2024 Ms. Kohn was forced to resign from the position of AP at the Academy.

186.    On September 4, 2024, during one of Ms. Kohn's last days of employment at the Academy, she took a sick day to visit her OBGYN.

187.    Soon thereafter, Ms. Kohn provided Bassell a note from her doctor to excuse her absence from work. The note was written on paper from her physician's prescription pad. Bassell declared that the note "was not good enough" and demanded that Ms. Kohn provide a note on her doctor's letterhead. When Ms. Ms. Kohn dutifully called her OBGYN to request the "appropriate note," the office informed her that the Academy had already contacted the OBGYN's office to confirm Ms. Kohn's appointment.

188.    Ms. Kohn, affronted by Bassell's intrusion into her personal health records, again called the DOE's Title IX Liaison to report Bassell's disturbing behavior. This time, she was determined to file a complaint. However, the Title IX Attorney she spoke with claimed that Ms. Kohn was no longer allowed to file a report because the statute of limitations had expired. This claim was false.

189.    Ms. Kohn involuntarily left her position at the Academy feeling discouraged and heartbroken that she had been unable to hold her abuser accountable, and deeply traumatized by the years of abuse she had endured. Ms. Kohn's last day at the

Academy was September 16, 2024.

**C. Ms. Kohn Reports Bassell's Sexual Harassment to the Superintendent's Office.**

190.    After teaching at a public school on Long Island during the 2024-2025 academic year, Ms. Kohn came to the conclusion that she missed serving as a school administrator and did not want to allow Bassell's misconduct to deter her from the career she had worked so hard to build.

191.    In mid-May 2025, Ms. Kohn thus began to apply for an AP position within the DOE again.

192.    Ms. Kohn needed a reference from a former supervisor as part of her application and did not feel comfortable asking Bassell. She decided to ask the Superintendent in charge of Queens North District 30, the DOE School District where the Academy is located.

193.    On May 17, 2025, Ms. Kohn contacted Superintendent Hoa Tu, stating that she was looking for a new AP position. Superintendent Tu agreed to serve as a reference for Ms. Kohn and said she would share Ms. Kohn's resume with principals at various schools.

194.    A few days later, Ms. Kohn also reached out to Abigail Lovejoy, the Administrator of Special Education in Superintendent Hoa's District, to let her know that she was seeking an AP position with the DOE again.

195.    When Ms. Kohn specifically noted that she did not want to work for Bassell again, Ms. Lovejoy asked Ms. Kohn if it was because of Bassell's "pervy stuff." Ms. Kohn responded in the affirmative and then disclosed Bassell's yearslong campaign of touching her unwanted ways, sending her sexually explicit messages, and making

unwelcome comments about sex.

196.     Ms. Lovejoy reported what Ms. Kohn told her about Bassell's sexual harassment to Superintendent Tu.  Superintendent Tu and Ms. Lovejoy recommended that Ms. Kohn file a complaint with the New York City Police Department ("NYPD").

197.     On Monday, May 26, 2025 (Memorial Day), Ms. Kohn, along with a former colleague, spoke with an NYPD Detective and told him about the history of Bassell's harassment and abuse.

198.     The next day, May 27, 2025, Bassell was arrested by the NYPD.

199.     The Queens County District Attorney's Office charged Bassell with crimes stemming from his behavior toward Ms. Kohn and another Academy faculty member.

200.     Bassell has been charged with the following crimes: Forcible Touching, in violation of New York Penal Law ("NYPL") § 130.52-1 and five counts of Sexual Abuse in the Third Degree, in violation of NYPL § 130.55.

201.     The docket number of Bassell's criminal case is CR-019926-25QN.

202.     Bassell's next court date in Queens Criminal Court is September 4, 2025.

**D. Bassell's Retaliatory Imposition of a "Problem Code" on Ms. Kohn's File.**

203.     Ms. Kohn, while bravely serving as a complaining witness in the criminal case, continued to look for work as an AP in order to get her career back on track.

204.     Yet, unbeknownst to her, Bassell had surreptitiously and unethically placed a significant obstacle in her way.

205.     On June 13, 2025, Ms. Kohn was hired as the I/A AP of Supervision, Students with Disabilities at the High School of Art and Design.  She was scheduled to begin work as a 12-month employee on July 1, 2025.

206.     However, in July of 2025, the Principal of the High School of Art and Design informed Ms. Kohn that her start date had been significantly delayed because he had discovered a "Problem Code" on her file.

207.     A Problem Code is an internal flag placed on a DOE employee's personnel file, effectively serving as a negative mark that warns school leaders and DOE central offices not to hire that individual.

208.     Ms. Kohn soon learned that Bassell had placed the Problem Code in Ms. Kohn's file for alleged "inappropriate use of a sick day" on September 4, 2024.  Bassell did this despite the fact that Ms. Kohn had provided him with two doctors' notes and there was nothing inappropriate about Ms. Kohn using a sick day to attend an appointment with her OBGYN.

209.     Bassell's act of placing a Problem Code on Ms. Kohn's file was a clear act of retaliation, not a legitimate personnel matter.  It is also yet another example of his gross abuse and misuse of his power as a school principal.

210.     Because of the Problem Code Bassell placed on Ms. Kohn's file, the DOE has struggled to clear the red tape necessary to hire Ms. Kohn, delaying her start date to late August 2025.

211.     This delay has cost Ms. Kohn significant lost wages and reduced her status from a 12-month employee to a 10-month employee for the 2025–2026 school year.

## VI.     THE DOE FAILED TO PROPERLY TRAIN ITS EMPLOYEES ON SEXUAL HARASSMENT AND SEXUAL ABUSE, THUS ALLOWING BASSELL TO ENGAGE IN RAMPANT SEXUAL ABUSE, IN VIOLATION OF THE U.S. CONSTITUTION.

212.     In the years leading up to Bassell's sexual assault of Ms. Leal in 2015, the DOE knew to a moral certainty that its employees were regularly confronting situations in

which female students were subject to abuse and harassment. The DOE further knew that its employees would have to make difficult decisions and choices about how to properly identify and report the abuse and harassment, and that they required training on these important topics.

213.    The Special Commissioner of Investigation ("SCI") is an independent watchdog agency tasked with investigating corruption and misconduct within the DOE. Between 2011 and 2014, SCI received 2,388 complaints of sexual misconduct involving "employees, individuals, and companies associated with the New York City Department of Education."[5]

214.    SCI reports show that in 2014, SCI received 582 complaints of sexual misconduct and substantiated 22.5% of these complaints.  SCI has specifically investigated numerous complaints against DOE principals and other administrators.  Since 1991, ten complaints have been substantiated.[6]

---

[5] *See* SCI 2011 Statistical Report (Jan. 4, 2012), https://www.nyc.gov/assets/doi/sci/releases/01-12-Statistics-2011.pdf (last visited Aug. 28, 2025); SCI 2012 Statistical Report (Jan. 8, 2013), https://nycsci.org/wp-content/uploads/2018/Public/01-13-Statistics-2012.pdf (last visited Aug. 28, 2025); SCI 2013 Statistical Report (January 7, 2014), https://nycsci.org/wp-content/uploads/2018/Public/01-14-STAT-REPORT-2013.pdf (last visited Aug. 28, 2025); SCI 2014 Statistical Report (January 8, 2015), https://www.nyc.gov/assets/doi/sci/releases/01-14-STATISTICS-REPORT-2014.pdf (last visited Aug. 28, 2025).

[6] *See* Press Release, SCI, School Principal Pleads Guilty to Sexual Abuse (Mar. 17, 1993) https://nycsci.org/wp-content/uploads/2018/Public/03-93-Friedman-Plea-Rel.pdf (last visited Aug. 28, 2025); Press Release, SCI, High School Dean Sexually Abused a 15-Year-Old Male Student (Jan. 31, 2001) https://nycsci.org/wp-content/uploads/2018/Public/01-01-Goldberg-Rel.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Edward Stancik to Chancellor Harold Levy (Jul. 20, 2001) https://nycsci.org/wp-content/uploads/2018/Reports/07-01-Ayed-letter-to-levy-LTR.pdf (last visited Aug. 28, 2025); Edward Stancik, *Report of the Special Commissioner of Investigation for the New York City: September 1, 1999-June 30, 2002* (Dec. 2003) https://nycsci.org/wp-content/uploads/2018/Reports/Annual-Report-1999-2002.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Joel Klein (Dec. 11, 2007) https://nycsci.org/wp-content/uploads/2018/Reports/12-07-Siegel-Lawrence-LTR.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Joel Klein (May 9, 2009) https://nycsci.org/wp-content/uploads/2018/Reports/05-09-Brown-Tyrone-Ltr.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Joel Klein (Jan. 6, 2010) https://nycsci.org/wp-content/uploads/2018/Reports/01-10-Cedeno-Quintin-Ltr.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Dennis Walcott (Jul. 30, 2013) https://nycsci.org/wp-content/uploads/2018/Reports/07-13-Taylor-Malik-Ltr.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Dennis Walcott (Sept. 4, 2013) https://nycsci.org/wp-

215.      There is also ample evidence that, at the time, New York City schools had a systemic problem with underreporting instances of sexual harassment and abuse.

216.      There are about 1.1 million students enrolled in DOE schools, and about 1.6 million enrolled in New York State schools outside of New York City. During the 2013-2014 school year, the DOE reported only 454 material incidents of sexual and gender harassment while the rest of New York State reported 2,247 material incidents of sexual and gender harassment. This means that, although New York City's population is approximately 43.44% of the state's overall population, it accounted for only 16.8% of the state's gender and sexual discrimination and harassment reports during the 2013-2014 school year. These figures evidence pervasive underreporting signaling a systemic failure to identify, respond to, and prevent sexual harassment and assault.

217.      The New York Attorney General's Office launched an investigation into these disparities, culminating in a 2016 letter report. The report concluded that there was "substantial underreporting of material incidents of harassment and discrimination by schools in New York City," and described staff training on harassment and discrimination as "sparse and inadequate."[7]

218.      The DOE therefore knew or should have known, long before Ms. Leal was assaulted by Bassell in 2015, that DOE staff required training on (1) how to recognize the signs and patterns of sexual harassment and abuse and (2) how to safely and effectively

---

content/uploads/2018/Reports/09-13-Abreu-and-Martinez-Ltr.pdf (last visited Aug. 28, 2025); Ashley Southall, "New York City Schools Official Charged with Sexual Abuse," The New York *Times* (Jun. 17, 2015) https://www.nytimes.com/2015/06/18/nyregion/new-york-city-schools-official-charged-with-sexual-abuse.html (last visited Aug. 28, 2025).
[7] New York State Educ. Dep't and New York Office of the Att'y General, Letter to District Superintendents on Dignity for All Students Act: Results of Statewide School District Survey and Guidance on Implementation 3 (Aug. 31, 2016) https://www.p12.nysed.gov/sss/documents/SED-AGLttrandGuidance8-31-16.pdf (last visited Aug. 29, 2025).

report potential sexual harassment and abuse.

219.     Yet despite the DOE's knowledge that sexual misconduct occurs in its schools and training is necessary in order to prevent it, employees at AAS did not begin to receive sexual harassment training until the spring of 2020.

220.     According to two AAS teachers who spent decades working for the Academy, the very first time faculty members received training on sexual harassment and sexual abuse was in 2020, just after the COVID-19 pandemic began.[8]

221.     These teachers recall that, after all DOE public schools switched to remote learning in March 2020, a number of AAS students began reporting that Bassell had inappropriately touched them, stared at their bodies, and made them feel uncomfortable in school.

222.     On June 4, 2020, an Instagram account was created called "AAS Takes a Stand."

223.     The account featured numerous posts detailing allegations from students who reported being harassed and assaulted by Bassell.

224.     For example, in one post, a student accused Bassell of repeatedly calling her out of class "to talk," but, in reality, he would "rub [her] arms and thighs for 30 min[utes]."

225.     A number of students accused Bassell of staring at and manufacturing reasons to touch their breasts. For instance, one student said that Bassell, after staring down

---

[8] One of the teachers is Ann Craven, who worked as a teacher for the DOE from 2002 until 2023.  Ms. Craven worked at Long Island City High School, where Bassell was Principal, from 2002-2012.  She then worked at AAS from 2012-2023.  Thus, for approximately 21 years, Ms. Craven worked at schools where Bassell held the role of Principal.  The other teacher has worked at the Academy for the past 20 years and still works there now.  Because Bassell still holds the role of Principal, she prefers to not reveal her name for fear of retaliation.

her shirt for a while, pretended to trip over seemingly nothing and then proceeded to grab her waist and breast "harshly" to steady himself. Another student said that, while checking IDs, Bassell would stop female students from entering the building by putting his hand on their chests even when their ID was already clearly displayed.

226.     In the wake of the AAS Takes a Stand posts, the DOE initiated a sexual harassment training for faculty members in June 2020.

227.     Prior to June 2020, Academy teachers had not received sexual harassment training.

228.     Therefore, prior to June 2020, Academy teachers were not trained on (1) detecting signs of sexual harassment or sexual abuse; or (2) how to report suspected sexual harassment or sexual abuse.

229.     Upon information and belief, Bassell intentionally withheld such training from AAS teachers prior to June 2020.

230.     Upon information and belief, the DOE allowed Bassell to withhold sexual harassment and sexual abuse training from AAS teachers prior to June 2020.

231.     Had teachers received training on detecting sexual abuse and how to report it in 2015, Ms. Leal's abuse could have been prevented or stopped.

232.     AAS teachers, including Ms. Craven, have been aware for years that Bassell engages in inappropriate conduct.

233.     For example, Ms. Craven and other teachers have witnessed Bassell leer at women's bodies.

234.     Ms. Craven and other teachers have seen Bassell hugging women for uncomfortably long periods of time.

235.     Ms. Craven and other teachers have seen Bassell touching women's bodies—including their shoulders, lower backs, and arms—during meetings.

236.     Ms. Craven knew that Bassell would call students—always females—to his office and spend a long time talking to them when those students were supposed to be in class.

237.     Ms. Craven knew Ms. Leal as a student in 2015 and 2016.

238.     In 2015 and 2016, Ms. Craven did not receive any training relating to sexual harassment or sexual abuse.

239.     In 2015 and 2016, Ms. Craven was not trained on detecting signs of sexual harassment or sexual abuse.

240.     In 2015 and 2016, Ms. Craven was not trained on how to report suspected sexual harassment or sexual abuse.

241.     Had Ms. Craven received such training in 2015 or 2016, she would have reported Bassell's inappropriate behavior.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Violation of the Equal Protection Clause – Persistent & Widespread Practice
42 U.S.C. § 1983
(By All Plaintiffs Against All Defendants)

242.     Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

243.     Defendant City had an informal policy or custom of tolerating sexual abuse and sexual harassment by Principal Bassell, in violation of Plaintiffs' constitutional rights.

41

244.    Defendant Bassell, an agent of Defendant City, engaged in a persistent practice of constitutional violations by groping, touching, and stroking the bodies of women and girls without their consent.

245.    Defendant Bassell, an agent of Defendant City, engaged in a persistent practice of constitutional violations by making lewd, graphic, and inappropriate sexual comments to women without their consent.

246.    Defendant Bassell, an agent of Defendant City, engaged in a persistent practice of constitutional violations by sending vulgar and sexual text messages to women without their consent.

247.    The DOE was aware of and deliberately indifferent to this pattern and practice of constitutional violations.

248.    When Plaintiffs reported Bassell's inappropriate and harassing behavior to the City (through its agency, the DOE), nothing was done to stop Bassell's conduct.

249.    The City (through its agency the DOE) protected Defendant Bassell by failing to stop his harassing conduct.

250.    Plaintiffs did not know this was a persistent and widespread practice until after May 27, 2025, the date when Defendant Bassell was arrested.  After May 27, 2025, it became public knowledge that Defendant had been engaging in this pattern of behavior for years and that the DOE had been protecting him the whole time.

**SECOND CAUSE OF ACTION**
Violation of the Equal Protection Clause – Failure to Train
42 U.S.C. § 1983
(By Plaintiff Leal Against Defendant City of New York)

251.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

252.    Defendant City of New York knew that its employees, including teachers at AAS, were confronting and would continue to confront situations in which female students were subject to abuse and harassment.

253.    Defendant City of New York knew that its employees, including teachers at AAS, would have to make difficult decisions and choices about how to properly identify and report the abuse and harassment.

254.    Despite this knowledge, Defendant City of New York, specifically City and DOE policymakers, failed to provide adequate training to its employees on identifying sexual harassment or sexual abuse of minors in the years that Ms. Leal was a student at AAS.

255.    Defendant City of New York, specifically City and DOE policymakers, also failed to provide adequate training to its employees on how to report suspected sexual harassment or sexual abuse of minors in the years that Ms. Leal was a student at AAS.

256.    Defendant City of New York's decision not to properly train its employees to identify and report the sexual abuse and harassment of minors will frequently cause the deprivation of female students' right to equal protection under the law.

257.    Defendant City of New York's failure to properly train employees to identify and report the sexual abuse and harassment of minors caused Plaintiff Leal to be deprived of her right to equal protection under the law.

258.    If not for Defendant City of New York's failure to train its employees, an AAS employee may have identified Ms. Leal as a victim of sexual abuse and harassment sooner or identified Defendant Bassell as a perpetrator before he had the chance to assault Ms. Leal.

259.    Ms. Leal was unaware of the City of New York's failure to train its

teachers on identifying and reporting sexual harassment and sexual abuse until May 29, 2025.

## THIRD CAUSE OF ACTION
Discrimination on the Basis of Sex in Violation of Title IX
20 U.S.C. § 1681
(On Behalf of All Plaintiffs Against Defendant City of New York)

260.    Plaintiff realleges as if fully set forth herein the allegations contained in the preceding paragraphs.

261.    The Academy of American Studies is an educational institution run and operated by the New York City Department of Education that receives federal financial assistance.

262.    The City, acting through its agency, the DOE, discriminated against Plaintiffs in violation of Title IX.

## FOURTH CAUSE OF ACTION
Retaliation in Violation of Title IX
20 U.S.C. § 1681
(On Behalf of All Plaintiffs Against Defendant City of New York)

263.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

264.    The Academy of American Studies is an educational institution run and operated by the New York City Department of Education that receives federal financial assistance.

265.    The City, acting through its agency, the DOE, retaliated against Plaintiffs Kohn, Murphy, and Sinatra after they complained about discrimination in violation of Title IX.

**FIFTH CAUSE OF ACTION**
Discrimination on the Basis of Gender in Violation of the NYCHRL
N.Y.C. Admin. Code § 8-107
(On Behalf of Plaintiffs Kohn, Murphy, and Sinatra Against All Defendants)

266.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

267.    At all relevant times, Plaintiffs Kohn, Murphy, and Sinatra were employed by Defendant the City of New York and Defendant Bassell served as their supervisor.

268.    Defendants intentionally and willfully discriminated against Kohn, Murphy, and Sinatra in the terms and conditions of their employment because of their sex in violation of the NYCHRL.

269.    Defendants' conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to Ms. Kohn, Ms. Murphy, and Ms. Sinatra's statutorily protected civil rights.

270.    As a direct and proximate result of Defendants' unlawful conduct, Ms. Kohn, Ms. Murphy, and Ms. Sinatra have suffered, and continue to suffer, substantial monetary damages.

**SIXTH CAUSE OF ACTION**
Retaliation in Violation of the NYCHRL
N.Y.C. Admin. Code § 8-107
(On Behalf of Plaintiffs Kohn, Murphy, and Sinatra Against All Defendants)

271.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

272.    Plaintiffs Kohn, Murphy, and Sinatra opposed Defendants' sexual harassment and other forms of discrimination against individuals on the basis of their sex.

273.    Defendants retaliated against Plaintiffs Kohn, Murphy, and Sinatra

Plaintiffs in the terms and conditions of their employment on the account of Plaintiffs'

opposition to Defendants' sexual harassment and discrimination, in violation of the New

York City Human Rights Law.

## SEVENTH CAUSE OF ACTION
Discrimination on the Basis of Gender in Violation of the NYSHRL
N.Y. Exec. Law § 296
(On Behalf of Plaintiffs Kohn, Murphy, and Sinatra Against All Defendants)

274.     Plaintiff realleges as if fully set forth herein the allegations contained in

the preceding paragraphs.

275.     At all relevant times, Plaintiffs Kohn, Murphy, and Sinatra were employed

by Defendant the City of New York and Defendant Bassell served as their supervisor.

276.     Defendants intentionally and willfully discriminated against Kohn,

Murphy, and Sinatra in the terms and conditions of their employment because of their sex in

violation of the NYCHRL.

277.     Defendants' conduct was outrageous and malicious, was intended to

injure, and was done with reckless indifference to Ms. Kohn, Ms. Murphy, and Ms. Sinatra's

statutorily protected civil rights.

278.     As a direct and proximate result of Defendants' unlawful conduct, Ms.

Kohn, Ms. Murphy, and Ms. Sinatra have suffered, and continue to suffer, substantial

monetary damages.

## EIGHTH CAUSE OF ACTION
Retaliation in Violation of the NYSHRL
N.Y. Exec. Law § 296
(On Behalf of Plaintiffs Kohn, Murphy, and Sinatra Against All Defendants)

279.     Plaintiffs realleges as if fully set forth herein the allegations contained in

the preceding paragraphs.

280.      Plaintiffs Kohn, Murphy, and Sinatra opposed Defendants' sexual

harassment and other forms of discrimination against individuals on the basis of their sex.

281.      Defendants retaliated against Plaintiffs Kohn, Murphy, and Sinatra

Plaintiffs in the terms and conditions of their employment on the account of Plaintiffs'

opposition to Defendants' sexual harassment and discrimination, in violation of the New

York State Human Rights Law.

### NINTH CAUSE OF ACTION
Failure to Pay Wages in Violation of the New York Labor Law
(NYLL §§ 191, 198)
(On Behalf of Plaintiff Kohn Against All Defendants)

282.      Plaintiff realleges as if fully set forth herein the allegations contained in

the preceding paragraphs.

283.      At all relevant times, Plaintiff Kohn was employed by Defendant City of

New York and Defendant Bassell served as her supervisor.

284.      Defendants willfully violated the rights of Plaintiff Kohn by failing to pay

her for work she performed between July 1, 2022, and August 28, 2022.

### JURY DEMAND

Plaintiffs demand a trial by jury.

### PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request judgment against Defendants as follows:

A.  An injunction preventing Bassell from sexually harassing his employees in the
    workplace;

B.  An injunction preventing Bassell from sexually abusing students who attend
    DOE-operated schools;

C.  An injunction requiring the City to train all DOE employees on its anti-retaliation policies and whistleblower protections;

D.  Compensatory damages in an amount to be determined at trial;

E.  Punitive damages in an amount to be determined at trial;

F.  Reasonable attorneys' fees, costs and disbursements under, *inter alia*, 42 U.S.C. § 1988(b) and N.Y.C. Admin. Code §§ 10-1104(c) and 8-502(g); and

G.  Such other and further relief as this Court deems just and equitable.


Dated:    New York, NY
          August 29, 2025

                                    **GISKAN SOLOTAROFF & ANDERSON LLP**


                          By:    /s/ *Amy E. Robinson*
                                 Amy E. Robinson
                                 Symone Yancey
                                 arobinson@gslawny.com
                                 syancey@gslawny.com
                                 (646) 964-9609
                                 1 Rockefeller Plaza, 8th Floor
                                 New York, NY 10020

                                 *Attorneys for Plaintiffs*