Amy Robinson, Esq.
Symone Yancey, Esq.
GISKAN SOLOTAROFF & ANDERSON, LLP
1 Rockefeller Plaza, 8th Floor
New York, New York 10020
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| LESLIE KOHN, TARA MURPHY, NICOLE SINATRA, KHIABET LEAL, and VERA REMETZ,<br><br>               Plaintiffs,<br><br>   v.<br><br>THE NEW YORK CITY DEPARTMENT OF EDUCATION and WILLIAM BASSELL,<br><br>               Defendants. | Civil Action No.: 1:25-CV-04831<br><br>**AMENDED COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

## PRELIMINARY STATEMENT

1.   This is a sexual assault and sexual harassment case brought by five brave women against their abuser, Principal William Bassell, and the deliberately indifferent municipal system that enabled him to terrorize them, the New York City Department of Education ("DOE").  For more than a decade, Bassell abused his power as Principal of the Academy of American Studies ("AAS" or the "Academy") to sexually harass, degrade, and assault female staff and students.  He regularly groped women on their inner thighs and other intimate areas of the body, leered at women's breasts, made unwelcome, vulgar, and sexually charged comments to women, and sent them lascivious text messages.  One of his victims was only 16 years old—a high school Junior—when Bassell groped her inner thigh.

2. While Bassell has been treating a New York City high school as his personal playground for sexual fulfillment, he has enjoyed the robust protections of the DOE: When the Plaintiffs complained about Bassell to the various municipal offices in charge of monitoring the DOE, they were either stonewalled or intimidated into silence. Then, Bassell, protected by the DOE and armed with powerful resources, retaliated against the women who had complained about him.

3. Finally, after being protected for decades, Bassell is now being held responsible for his reprehensible acts. In May 2025, Plaintiff Leslie Kohn courageously reported Bassell's unlawful behavior to the police, resulting in Bassell's arrest and ongoing prosecution for sex abuse and forcible touching. He is currently on leave from AAS, though he maintains the role of Principal.

4. The Plaintiffs in this action, Khiabet Leal, Nicole Sinatra (formerly Colon), Tara Murphy, Vera Remetz, and Ms. Kohn, are public school teachers, administrators, and guidance counselors who work for the DOE. They are dedicated public servants who have decided to come forward with their allegations after years—or even decades—of harassment and intimidation. Ms. Leal, Ms. Sinatra, Ms. Murphy, Ms. Remetz, and Ms. Kohn seek accountability and justice for what Bassell forced them (and likely many other women) to endure. Their hope is that Bassell will never be able to abuse his power again.

5. Based on the information available to Plaintiffs, it is nearly certain that there are dozens of other women and girls who were abused by Bassell. However, because Bassell still holds the title of Principal, many of his victims are unwilling to come forward publicly for fear of retaliation. (Indeed, one of the Plaintiffs, Ms. Remetz, has decided to pursue her claims against Defendants despite her intense fear of retaliation.) Until Bassell is truly held

2

accountable for his actions, justice cannot be served.

## PARTIES

6. Plaintiff Leslie Kohn is domiciled in Nassau County, New York.

7. Plaintiff Tara Murphy is domiciled in Queens County, New York.

8. Plaintiff Nicole Sinatra (formerly Nicole Colon) is domiciled in Queens County, New York.

9. Plaintiff Khiabet Leal is domiciled in Queens County, New York.

10. Plaintiff Vera Remetz is domiciled in Queens County, New York.

11. Defendant New York City Department of Education (the "DOE") is a municipal corporation headquartered at 52 Chambers Street, New York, NY 10007. The DOE is responsible for 1,866 public schools, which operate in all five boroughs of New York City and are attended by approximately 1.1 million New York City schoolchildren.

12. The Academy of American Studies ("AAS" or the "Academy"), located in Long Island City at 40-11 28 Street, Queens, NY 11101, is one of the public schools the DOE is responsible for.

13. The DOE is responsible for the policy, practice, supervision, implementation, and conduct of all DOE matters and for the appointment, training, supervision, and conduct of all DOE personnel.

14. The DOE is responsible for ensuring that its personnel obey the Constitution and law of the United States and the State of New York.

15. Defendant DOE employs Defendant William Bassell as the Principal of the Academy of American Studies.

16. Defendant William Bassell is a resident of Ossining, New York.

3

17. Defendant Bassell has served as Principal of the Academy of American Studies since 2011.  Prior to that, he served as Principal of Long Island City ("LIC") High School, another public school that is maintained and operated by the DOE.

18. Defendant Bassell is one of the longest-serving Principals in the DOE.

19. Defendant Bassell is an employee of Defendant DOE and has been an employee of Defendant DOE for more than 40 years.

20. Additionally, Defendant Bassell has for years held a powerful position on the union representing Principals and Assistant Principals, the Council of School Supervisors and Administrators ("CSA").

21. At all times relevant, the DOE was required to ensure the safety and security of the students at AAS.

22. At all times relevant, the DOE had a duty and responsibility to ensure the safety and security of the students at AAS.

**JURISDICTION AND VENUE**

23. This action arises under the Fourteenth Amendment to the United States Constitution (the "Fourteenth Amendment"); the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"); Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* ("Title IX"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"); the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.* ("NYCHRL"); and New York common law.

24. This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331(a) and 1343(4).

4

25.     This Court has supplemental jurisdiction over the State and City law claims based on 28 U.S.C. § 1367.

26.     Venue is properly before this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this claim occurred in this District.

27.     Prior to filing their Title VII claims in Court, Plaintiffs Leslie Kohn and Tara Murphy filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 10, 2025.

28.     On February 26, 2026, Ms. Kohn and Ms. Murphy received Notices of Right to Sue from the EEOC.

29.     Pursuant to N.Y. Gen. Mun. Law § 50-e, Plaintiff Leslie Kohn filed a timely Notice of Claim on November 21, 2025.

## **BACKGROUND**

**I.      PRINCIPAL BASSELL, PROTECTED BY THE DOE, HAS CREATED A CULTURE OF SEXUAL HARASSMENT AND RETALIATION AT THE ACADEMY OF AMERICAN STUDIES.**

30.     William Bassell, the Principal of AAS for the last 14 years, has systematically leveraged his authority to sexually harass and abuse female students and faculty.  The DOE has been aware of Bassell's conduct since at least 2016, but it has exhibited deliberate indifference by failing to act and protect the women and girls at the Academy, thereby allowing a serial predator to use a New York City public school as a venue for grooming and sexual assault.

31.     With the benefit of the DOE's deliberate indifference, Bassell—widely known as "Creepy Bill," "Creepy Bassell," or simply "Creep" by students and faculty

members at the Academy—has, *for more than a decade*, targeted female employees and at least one female student, singling them out for illegal touching, texting, and commentary.

32. Bassell has engaged in a litany of sexually harassing acts, including:

- Stroking, rubbing and groping women on intimate parts of their bodies, including the inner thigh, feet, and neck, without their consent;

- Asking women about their private sex lives, including questions about their virginity and masturbation;

- Gossiping about the intimate details of his students' sex lives;

- Making lewd comments and "jokes" about ejaculation and oral sex; and

- Leering at women's bodies, especially their breasts and buttocks.

33. Bassell is known to favor young and conventionally attractive women for job openings at the Academy.  In fact, Bassell's penchant for hiring young and attractive women is so well known that faculty members referred to the all-female team of Guidance Counselors at AAS as Bassell's "Harem."

34. Bassell frequently made crude and sexual comments at work.  For example, he casually revealed to a teacher that one of the female Assistant Principals ("APs") had "gotten so fat that her husband wouldn't fuck her."  On another occasion, when one of the Guidance Counselors declined to participate in a group outing, Bassell said, "I can make her come…oh, *I can make her cum*."  In yet another instance, Bassell told a group of female employees that "the only reason [male student] comes to school is because [female student] sucks his dick."

35. Bassell's verbal harassment of women often turned physical.  He frequently invaded the offices of female APs and Guidance Counselors and touched their bodies in

unsolicited, unwelcome, and sexually charged ways. During meetings, he frequently stroked women's arms or lower backs without their consent. Plaintiffs Leslie Kohn and Vera Remetz were summoned to Bassell's office or approached at their desks by Bassell under the pretense of reviewing work-related matters only for him to proceed to grope and rub their inner thighs without their consent.

36. Bassell also, of course, retaliated against the women who dared to report him or oppose his harassment. This retaliation ranged from threatening their jobs when they rejected his physical advances, as he did to Plaintiff Tara Murphy, to cruelly and publicly berating them, as he did to Plaintiff Nicole Sinatra after she reported him to the DOE.

37. Shockingly, the DOE knew about Bassell's sexual harassment and abuse long before 2016 (and likely even as early as 2002). In 2016, a brave 17-year-old student—Plaintiff Khiabet Leal—told multiple teachers and her Guidance Counselor, Plaintiff Nicole Sinatra, that Bassell had sexually assaulted her during a school field trip. Ms. Sinatra dutifully reported the incident directly to the DOE. Instead of protecting Ms. Leal, DOE investigators interrogated her, expressing derisive skepticism of her account, and made a thinly veiled threat about her prospects for college. The DOE failed to remedy the problem, allowing Bassell to remain in the same position of power, where he continued harassing and assaulting women at the Academy. Had the DOE acted in or before 2016, it could have prevented many women from sexual harassment.

38. In recent years, Ms. Kohn and Ms. Murphy attempted to report Bassell's inappropriate behavior, but the DOE continued its pattern and practice of protecting Bassell by discouraging women from making formal complaints. For example, in September 2022, a Title IX officer employed by the DOE told Ms. Kohn that reporting Bassell would be futile

because he was "untouchable." In 2024, a union representative told Ms. Murphy that Bassell is "Teflon Don" because "nothing sticks to him." The union representative further warned that if Ms. Murphy reported Bassell for sexual harassment she would "go down swinging." With each failure to investigate an individual complaint and hold Bassell accountable for his actions, the DOE allowed Bassell to prey on other women and girls at the Academy.

## II. KHIABET LEAL'S FACTUAL ALLEGATIONS.

### A. Ms. Leal's Background.

39. Plaintiff Khiabet Leal is the embodiment of the American Dream. A daughter of immigrants, she grew up in Queens, NY, with limited resources and learning English as a second language.

40. Through hard work and perseverance, Ms. Leal has achieved notable success: she earned a B.A. in Elementary Education and Drama Theater, an M.A. in Education, and an M.S.Ed. in Integrated Bilingual Special Education, all from Queens College, City University of New York.

41. Ms. Leal is the first person in her family to attend and graduate college.

42. Since September 2021, Ms. Leal has worked as a public-school teacher in Queens. She has taught First Grade, Second Grade Integrated Co-Teaching ("ICT"), and Dance.

43. Ms. Leal's path to success was not easy. And it was almost derailed by Bassell.

44. In the fall of 2013, Ms. Leal enrolled in the Academy as a Sophomore in high school.

45. Ms. Leal had transferred to the Academy from another high school because she was severely bullied at her prior school. AAS administrators (including Bassell) were aware

8

of the circumstances of Ms. Leal's transfer.

46. Bassell knew Ms. Leal had a history of being bullied and that she was vulnerable.

47. Starting during Ms. Leal's junior year, Bassell would sometimes summon her to his office for casual discussions. Bassell always seemed excited to see Ms. Leal and made her feel welcome. Ms. Leal, an ambitious and bright student who yearned to be the first person in her family to attend college, was honored to be given this type of special attention from her school's Principal.

48. Having a positive relationship with the school's Principal was important for Ms. Leal. She knew that cultivating strong relationships with teachers was one of the many steps to getting into a good college.

49. Ms. Leal initially admired Bassell. She believed that he was someone she could trust.

## B. Bassell Sexually Assaults Ms. Leal.

50. Bassell, in addition to serving as Principal, also teaches a class on Opera at AAS.

51. Ms. Leal enrolled in Bassell's Opera class.

52. As part of the Opera class, Bassell took his students to the Metropolitan Opera at Lincoln Center every year.

53. Ms. Leal's class attended the opera on Friday, February 13, 2015. Ms. Leal was 16 years old at the time. Bassell chaperoned the group.

54. Ms. Leal remembers the date of the opera because a friend had given her a small but memorable pre-Valentine's Day gift: a bag of hazelnut chocolates. Ms. Leal remembers holding the gift bag in her hand while she watched the opera.

55. During the opera, Ms. Leal began to experience a migraine, a chronic health issue

9

for her at the time.  Along with a sharp headache, Ms. Leal felt nauseated and had a stomach ache.

56. At intermission, Ms. Leal stepped into the lobby to get some air.  Still feeling ill, she sat down on the red carpet in the lobby of the Metropolitan Opera House.

57. Bassell approached Ms. Leal and crouched down beside her.  He asked if she was all right.

58. Ms. Leal thought that Bassell was simply concerned about her illness and kindly checking in.  But then, Bassell, without saying a word, reached underneath Ms. Leal's skirt and placed his hand on Ms. Leal's inner, upper thigh, groping her and rubbing up and down her leg for several moments.  Bassell's hand was in direct contact with her skin on her inner thigh.

59. Ms. Leal froze.

60. Ms. Leal did not consent to this touching—nor could she, as she was a minor and a student at Bassell's school—and was shocked by Bassell's actions.

61. As soon as Ms. Leal mustered the strength, she stood up and walked away.  She stood next to other students from the Academy, where she hoped she would be safe.

62. The following week at school, Bassell treated Ms. Leal as if he had not sexually assaulted her.  He did not appear contrite or embarrassed by his behavior.

63. Thereafter, Bassell continued his practice of summoning Ms. Leal to his office in the middle of class, giving no explanation to her teachers.  During some of these trips to Bassell's office, he offered to write a letter of recommendation for Ms. Leal for college.

C. **After Ms. Leal Reports Bassell, DOE Investigators Intimidate her into Silence.**

64. During the 2015-2016 school year, when Ms. Leal was a Senior at the Academy,

she told two trusted teachers about Bassell's sexual assault.

65. Ms. Leal believes she spoke with these teachers in early 2016. She cannot recall the exact month or day when she reported the assault to the teachers.

66. The teachers then disclosed Ms. Leal's account to a guidance counselor, Plaintiff Nicole Sinatra. Ms. Leal met with Ms. Sinatra separately and disclosed Bassell's sexual harassment at the opera.

67. A few days or weeks later, Ms. Leal was abruptly summoned away from class. A group of three or four adults, all dressed in dark suits and holding clipboards, escorted her out of class and into an empty classroom. To the best of Ms. Leal's recollection, the adults did not disclose their names, where they were from, or why they were at her school.

68. As Ms. Leal waited in an empty classroom, alone, she could hear and see the investigators speaking to Bassell just outside the room. At that point she began to put the pieces together; she assumed the suit-wearing adults were investigating her allegations against Bassell.

69. The investigators eventually entered the classroom and explained that they were investigating Ms. Leal's claim that Bassell had touched her inappropriately on February 13, 2015.

70. The nameless interviewers did not provide business cards or write down their names or phone numbers for Ms. Leal. They did not ask Ms. Leal if she wanted an adult, such as a parent or teacher, present for the interrogation. (In fact, Ms. Leal believes the DOE did not inform her parents that she was being interrogated.) The nameless investigators simply proceeded to interview Ms. Leal, a teenaged daughter of immigrants accusing the school principal of assault, with no protections in place.

11

71. The investigators asked Ms. Leal to provide a statement about exactly what Bassell had done to her.

72. Ms. Leal truthfully described how Bassell had groped and stroked her upper, inner thigh without her consent or permission while she sat on the floor of the opera house, feeling unwell.  The investigators took handwritten notes.

73. The investigators repeatedly questioned Ms. Leal's account.  They treated her with skepticism.  Ms. Leal recalls the investigators asking, "are you sure he touched you like that? Are you *sure* he did that?"

74. Ms. Leal also recalls the investigators saying, "Isn't he writing you a recommendation letter for college?"  This question invoked great fear in Ms. Leal, as her lifelong goal was to attend college and she did not want to do anything to jeopardize her prospects.

75. The interview left Ms. Leal feeling confused, hurt, and scared that she had done the wrong thing by coming forward about Bassell's unwanted groping.

76. Ms. Leal never heard anything further from the investigators.  Bassell continued to serve as Principal of the Academy.

77. Ms. Leal, feeling isolated and scared, did all she could to forget about Bassell's assault.  She focused exclusively on her studies and enrolling in college.

78. For the next nine years, Ms. Leal did her best not to think about Bassell or the incident at the Metropolitan Opera.  But despite her best efforts to block the assault out of her mind, it haunted her psychologically: she found herself unable to trust men and has struggled to be intimate with men.  Ms. Leal attributes this to having been sexually assaulted by a man she trusted, a man more than 40 years her senior.

79. On May 29, 2025, Ms. Leal learned that Bassell had been arrested by the New York Police Department and charged with forcible touching and assault by the Queens County District Attorney's Office.

80. Ms. Leal was horrified to learn that the complaining witnesses were faculty members at the Academy.

81. Former teachers of Ms. Leal's began to contact her. They shared the news about Bassell's arrest and expressed deep regret for not doing more to protect her when she was in high school.

82. The news of Bassell's arrest and prosecution was jarring to Ms. Leal. Although she knew that what Bassell had done to her was wrong, she had not previously known that other women had also been subjected to his forcible touching.

83. Even more shocking to Ms. Leal was learning for the first time that numerous AAS teachers had been aware that Bassell had preyed upon her.

84. A message from one former teacher stated: "I always think about you and how the DOE turned its back on what happened."

85. Another teacher wrote that Bassell's arrest had made them think about "how nothing was done to protect [Ms. Leal] or any other student."

86. Prior to May 29, 2025, Ms. Leal had been unaware that the DOE had failed to protect her from a predator.

87. May 29, 2025, was the first time Ms. Leal became aware that the abuse she had endured—and the DOE's failure to protect her from Bassell—had not been an isolated incident but rather, was part of a pattern and practice of constitutional violations by Bassell and the DOE.

13

88. Prior to May 29, 2025, Ms. Leal was not aware that the DOE maintains a policy and practice of allowing Bassell to sexually harass, assault, and retaliate against female students and faculty and of silencig women and girls who are brave enough to report his illegal behavior.

## III.   NICOLE SINATRA'S FACTUAL ALLEGATIONS.

### A.  Decades of Dedication: Ms. Sinatra's Work as a NYC Guidance Counselor

89. Ms. Sinatra has worked as a school guidance counselor in the New York City public school system since 1997, guiding and supporting thousands of students in their most formative years.  Backed by a master's degree in School Counseling from Brooklyn College and a certification as a secondary and elementary school counselor, Ms. Sinatra has dedicated her career to public service.

90. Ms. Sinatra began working at the Academy in January 2000.

91. At the end of the 2011-2012 school year, Bassell wrote Ms. Sinatra a handwritten note thanking her for her contributions to the school.  Bassell wrote her another handwritten note of appreciation at the end of the 2013-2014 school year.

92. Prior to the 2016 school year, when Ms. Sinatra reported Bassell for sexually abusing a minor, Ms. Sinatra's professional relationship with Bassell was cordial and without incident—he was appreciative of her hard work and never raised concerns about her performance.

### B.  Ms. Sinatra Reports Bassell for Sexually Abusing Ms. Leal.

93. During the 2015-2016 school year, two Academy teachers approached Ms. Sinatra and informed her that Khiabet Leal, a senior at the Academy, had accused Bassell of inappropriately touching her during a school trip he chaperoned to Lincoln Center.

14

94. Ms. Sinatra met with Ms. Leal soon thereafter.  Ms. Sinatra believes this meeting took place in early 2016.

95. Ms. Leal confided in Ms. Sinatra about the incident, describing how Bassell had preyed upon her at the opera when she was feeling ill and had groped and rubbed his hand along her inner thigh without her consent.

96. Ms. Sinatra was shocked to hear about Bassell's abusive behavior, especially towards a minor student.

97. Ms. Sinatra recalled having seen Ms. Leal sitting in Bassell's office multiple times in the months prior.  She found it strange that Bassell would call Ms. Leal out of class so frequently.

98. After Ms. Leal's disclosure about Bassell's treatment of her at the opera, Ms. Sinatra acted swiftly to report the incident.

99. First, Ms. Sinatra reported Ms. Leal's allegation to two of the Academy's United Federation of Teachers ("UFT") Union Representatives,[1] both of whom advised her to report the incident directly to the DOE.

100. One of the union representatives told Ms. Sinatra that it was possible Bassell would find out that she had reported him and could learn her identity.

101. Ms. Sinatra was frightened and intimidated to learn that Bassell could learn that she was a whistleblower.  Even though her own relationship with Bassell had always been cordial, she was aware he yielded power and influence within the DOE.  She therefore understood that reporting Bassell could jeopardize her career.

---

[1] The UFT is the union that represents teachers and faculty members employed by the DOE.  The Chapter Leader is a DOE employee who works for the school and serves as the liaison between a school's unionized members and the UFT.

15

102. Despite her fears, Ms. Sinatra bravely traveled to the DOE office that the union representatives directed her to.

103. At the DOE office, Ms. Sinatra spoke with a group of investigators and gave her account of what Ms. Leal had reported to her.

104. After leaving the DOE that day, Ms. Sinatra never heard from them about this issue again. The DOE investigators never followed up to gather more information, to discuss next steps, or to update Ms. Sinatra about their investigation.

105. Bassell continued to serve as Principal with no apparent diminution to his power or authority.

**C. Bassell Retaliates Against Ms. Sinatra for Reporting him to the DOE.**

106. Ms. Sinatra's worst fears about Bassell were soon borne out. Soon after Ms. Sinatra spoke with DOE investigators and reported Bassell for inappropriately touching Ms. Leal, Bassell began to retaliate against Ms. Sinatra.

107. Ms. Sinatra first met Bassell in 1997, when he was principal of LIC High School and she worked there.

108. Bassell had been polite and cordial when he interacted with Ms. Sinatra during their time together at LIC High School and later, when they both worked at AAS.

109. Suddenly, in 2016, soon after Ms. Sinatra reported Bassell to the DOE, Bassell began to constantly criticize her work, the same work he had been entirely satisfied with just a few weeks prior.

110. Bassell's entire demeanor toward Ms. Sinatra shifted drastically after she reported him to the DOE for assaulting Ms. Leal.

16

111. Bassell began to speak condescendingly toward Ms. Sinatra. He made sarcastic comments to Ms. Sinatra, raised his voice when speaking to her, glared menacingly when he encountered her in the hallway at school, blamed her for problems she did not cause, and berated her until she cried.

112. Bassell had not engaged in any of these behaviors toward Ms. Sinatra prior to 2016.

113. For example, when a student was having trouble arriving to school on time for an early morning course, Ms. Sinatra approached Bassell about switching the student to a later time slot. Rather than acknowledging Ms. Sinatra's efforts, Bassell screamed at Ms. Sinatra, blaming her and repeatedly saying, "it's your fault isn't it? Isn't it?" Even when Ms. Sinatra began to cry and tremble, Bassell continued to scream at her.

114. In another instance, Bassell yelled at Ms. Sinatra for using the bathroom too frequently and told her that one of her coworkers had "reported" her. (The coworker later denied that she had reported Ms. Sinatra for anything, yet alone something as trivial as using the bathroom.)

115. Ms. Sinatra came to fear interactions with Bassell so much that she began asking colleagues to accompany her when she needed to speak with him.

116. Bassell's abusive and retaliatory behavior eventually caused Ms. Sinatra to develop extreme anxiety.

117. Ms. Sinatra's anxiety made it difficult for her to sleep at night. She often slept poorly or not at all, which caused her to feel exhausted almost every morning.

118. In addition, Ms. Sinatra's fear of facing Bassell caused her to have frequent panic attacks.

17

119.      As a result, Ms. Sinatra sometimes arrived approximately 5-7 minutes late to work.  She was rarely more than a few minutes late, and she always made up any time she missed by working late, often well past her official end time.  Because Ms. Sinatra is not a classroom teacher, her very minor tardiness did not have a negative impact on the Academy's students.

120.      Moreover, Ms. Sinatra was diligent about calling her office when she was running late and explained that she had a medical issue.

121.      Despite being aware that Ms. Sinatra had a medical issue, Bassell berated her for her tardiness and wrote her up for being late at every possible opportunity.

122.      Upon information and belief, other Academy employees also sometimes arrived late for work, but Bassell did not berate them or write them up for tardiness.  He specifically targeted Ms. Sinatra.

123.      In November of 2018, after receiving multiple write-ups for her tardiness, Ms. Sinatra procured a note from her doctor, which stated that she required a more flexible work schedule due to a medical condition.  Ms. Sinatra provided this note to the payroll secretary and to her direct supervisor, the AP of the Guidance Department and Organization.  She also provided updated doctors' notes in October 2019 and October 2023.

124.      Bassell refused to acknowledge Ms. Sinatra's request for a reasonable accommodation for her disability and continued to write her up for tardiness, even if Ms. Sinatra arrived just one minute late.

125.      Upon information and belief, Bassell did not punish other faculty members who arrived late at work.  Bassell mistreated Ms. Sinatra because he knew she had reported him to the DOE.

18

126.     In or around May 2023, Bassell called Ms. Sinatra into his office to, once again, berate her for tardiness.  On this occasion, she reminded him that she had a medical condition which often made it difficult for her to arrive to work exactly on time.  Bassell yelled: "I don't care about your medical condition!"

127.     Ms. Sinatra's colleagues, unlike Bassell, respect her and expressed appreciation for her hard work.  For instance, on February 16, 2024, the Academy's AP of the Guidance Department wrote Ms. Sinatra a letter thanking her for providing supportive care to a student in crisis outside of her contractual work hours.  The letter praised Ms. Sinatra's "consistent efforts to prioritize the well-being of the student, while ensuring all protocols were followed meticulously."

128.     In another letter dated January 6, 2025, the AP of the Guidance Department expressed gratitude to Ms. Sinatra for the "dedication and the effort [she] put into [her] work every day."

129.     On the other end of the spectrum, Bassell would sometimes ignore Ms. Sinatra completely or intentionally exclude her from meetings that all other AAS Guidance Counselors were invited to and where her attendance would have made sense.

130.     For example, in or around 2021, Bassell interviewed candidates to join the Guidance Counselor team.  Ms. Sinatra was the only Guidance Counselor who was not invited to sit in on the interviews, despite being the most senior.

131.     These actions left Ms. Sinatra isolated at work and interfered with her ability to complete all her tasks effectively.

19

132.    Bassell's intimidating and retaliatory behavior towards Ms. Sinatra continued consistently and relentlessly from the time Ms. Sinatra reported Bassell to the DOE in approximately 2016 until his arrest in May 2025.

133.    Prior to learning of Bassell's arrest in late May 2025, Ms. Sinatra was not aware of the extent of Bassell's harassment and retaliation and was also not aware of the DOE's efforts to protect Bassell.  In late May 2025, Ms. Sinatra became aware that the DOE maintains a policy and practice of allowing Bassell to sexually harass, assault, and retaliate against female students and faculty and of silencing the women and girls who are brave enough to report his illegal behavior.

## IV.    TARA MURPHY'S FACTUAL ALLEGATIONS.

### A. Bassell Starts Making Sexual Comments to Ms. Murphy Within Weeks of her Start Date.

134.    Tara Murphy, a Licensed Social Worker ("LSW") was hired as a school Social Worker at the Academy in late June of 2021, immediately following graduation from her master's degree program.  It was her first job.  At the time, she was 25 years old.

135.    Ms. Murphy was inspired to become a social worker because of the difficulties she faced in her own childhood; she wanted to support students encountering similar challenges and remind them that they were not alone.

136.    Within a few weeks of Ms. Murphy's start date at AAS, Bassell began making inappropriate, sexual comments to her.

137.    For example, in October 2021, during a meeting with Ms. Murphy and another co-worker, Bassell asked Ms. Murphy about her Halloween costume and how much skin she planned to show.  Ms. Murphy quickly changed the subject, but Bassell continued to ask similar questions every year around Halloween.

20

138.    Bassell also made multiple inappropriate and unwanted sexual comments about Ms. Murphy's then-fiancé (now husband), saying "he's not good for you, you should be with a real man."  At one point, Bassell, unsolicited, pressed his cheek against Ms. Murphy's face and whispered into her ear, "you deserve a husband who will clean and cook for you."

139.    Bassell touched Ms. Murphy inappropriately as well.  In the mornings, on the way to his office, Bassell frequently cornered Ms. Murphy in the hallway, pressing his body close to hers and sometimes rubbing her arms or upper back.  Bassell also gave Ms. Murphy long, lingering hugs while rubbing her back whenever he thought she seemed sad or if he had good news for her.

140.    Additionally, whenever Ms. Murphy wore a dress to work, Bassell would leer at her, especially when she bent over.  Multiple students noticed Bassell's inappropriate staring and warned Ms. Murphy.  Ms. Murphy was mortified, but in an effort to shield her students from the awful truth, dismissed their concerns and made excuses for Bassell.

141.    Ms. Murphy began to notice that Bassell was disturbingly preoccupied with the sex lives of his underage charges.  Bassell took particular interest in certain female students and routinely pressured Ms. Murphy to disclose details about these girls' intimate and sexual encounters.

142.    As the school's Social Worker, Ms. Murphy's job entailed speaking with students about sensitive situations, such as abuse or mental health issues.  She was thus privy to confidential and private student information.  Bassell frequently and inappropriately asked Ms. Murphy questions about the sex lives of certain students.  Ms. Murphy, horrified, once cautioned Bassell that his behavior could run afoul of certain confidentiality laws, but he

dismissed this concern, stating that he had the authority to ask these questions as a "school leader."

143.    Bassell often gossiped to Ms. Murphy and her colleagues about the sex lives of students, once telling Ms. Murphy that a particular female student had agreed that she would "suck [male student's] dick." Ms. Murphy was appalled and offended by Bassell's conduct.

144.    On another occasion, in the spring of 2022, Bassell told Ms. Murphy that he believed a female student had performed a sexual act in a coffee shop bathroom. Bassell then asked Ms. Murphy about her own sexual experiences as a teenager and whether she had ever had sex in a location other than a bed.

145.    Ms. Murphy changed the subject and refused to answer these questions, but Bassell continued to badger her for an answer over the next few months.

### B. Ms. Murphy's Complaints Fall on Deaf Ears.

146.    In April 2022, Ms. Murphy contacted one of the Academy's UFT Chapter Leaders, and reported Bassell's inappropriate sexual behavior towards herself, as well as his inappropriate interest in the personal lives of AAS students.

147.    The UFT Chapter Leader agreed that Bassell's conduct was "messed up," and said that many other women had complained about Bassell as well. The UFT Chapter Leader discouraged Ms. Murphy from making a formal complaint against Bassell, cautioning that it "wouldn't go anywhere" and that Ms. Murphy should be prepared for backlash from Bassell. The UFT Chapter Leader never informed Ms. Murphy that she could make an anonymous complaint; never informed Ms. Murphy about the DOE's strict no-retaliation policy; never told Ms. Murphy that whistleblowers are protected under the law; and never

told Ms. Murphy that if she believes she is being retaliated against for complaining, then she should report such retaliation to the DOE.

148.     Without the support of her union, Ms. Murphy did her best to create boundaries between herself and Bassell.  For example, when Bassell attempted to give Ms. Murphy long hugs or rub her back, which were unwelcome and non-consensual, Ms. Murphy would become stiff like a board rather than hugging him back.  If Bassell was in Ms. Murphy's office and approached her physically, Ms. Murphy would open her desk drawer to create a physical barrier between them, though he would often just shut the desk drawer again and continue moving closer to her.  And when Bassell talked about sex or made sexual comments, Ms. Murphy would redirect the conversation or remind him that he was the same age as her father.

149.     Another strategy Ms. Murphy employed in order to protect herself from unwanted touching or sexual comments and to avoid any potential 1:1 interactions with Bassell was to overbook her schedule with counseling sessions.  For three years, Ms. Murphy made sure she had a student in her office for counseling almost every single period of the school day.  Ms. Murphy forwent her lunch breaks nearly every day for three years in order to avoid Bassell.  Additionally, Ms. Murphy went hours without using the bathroom each day to avoid running into Bassell in the hallway, which led to frequent urinary tract infections.

### C. Bassell Retaliates Against Ms. Murphy.

150.     When Ms. Murphy refused to reciprocate Bassell's unwanted sexual advances, he retaliated against her.  Initially, Bassell would simply roll his eyes and glare at Ms. Murphy with a huff when she refused to hug him or flirt with him, but as she continued to rebuff Bassell, the retaliation escalated: Bassell began spreading false rumors that Ms.

Murphy was not doing her job properly.

151.    Ms. Murphy once overheard Bassell maliciously state, "I don't think we are going to move forward with tenure with Tara.  Tara is immature."[2]

152.    Bassell's statements were demonstrably untrue; Ms. Murphy consistently received the highest possible scores on her performance reviews.

153.    A number of Ms. Murphy's colleagues urged her to flirt with Bassell in order to achieve tenure.  Ms. Murphy refused.

154.    In addition to spreading false rumors about Ms. Murphy, Bassell also retaliated by outright ignoring Ms. Murphy's work-related requests, thus making it difficult for Ms. Murphy to carry out the duties of her job.  For example, when Ms. Murphy required Bassell's approval to attend a DOE-sponsored event during work hours, which would count as a necessary continuing education credit for her LSW credential, he ignored her emails and, when she approached him in the hallway, said he didn't have time to talk with her.  This caused Ms. Murphy to miss out on this free opportunity, meaning she had to pay for an extra continuing education credit later.

155.    Bassell failed to demonstrate basic professionalism toward Ms. Murphy. For example, to receive tenure, Ms. Murphy was required to be observed during a counseling session with a student.  Ms. Murphy attempted to schedule Bassell's observation in advance so that she could obtain the student's permission to have him attend the session.  Instead, Bassell showed up unannounced to a session with a female student who did not want him there (and whose sex life he had taken a lurid interest in).

---

[2] "Tenure" is a legal status that a public-school employee can obtain after remaining successfully employed at a school for a given number of years. Tenure provides considerable job protections, like making it more difficult to be dismissed without proper cause and due process.

156.    Ms. Murphy was afraid to report any of Bassell's retaliation for fear that she could lose her employment at the Academy as Bassell frequently made clear that Ms. Murphy was lucky to have her position because the DOE did not hire many social workers at the time.  Bassell would gratuitously and cruelly tell Ms. Murphy that "a school can't function without teachers, but it can function without a social worker and guidance counselors."  Ms. Murphy believes that Bassell said this in order to stoke fear in her about job instability and in an attempt to make her express gratitude to Bassell for employing her. It was obvious to Ms. Murphy that this was yet another mind-game that Bassell played.

157.    Ms. Murphy had been hired pursuant to a grant allocated to schools by the Biden administration to ensure they had adequate funds for mental health and substance abuse services—but it only provided enough funding for three years. Accordingly, Bassell often reminded Ms. Murphy that she was on a "countdown" until her "Biden Money" was gone.

## D. Bassell Assaults Ms. Murphy, Touching her Without Permission and Whispering Vulgarities in her Ear.

158.    In March 2024, during a department meeting attended by a number of other staff members of the Guidance Department, including Plaintiff Nicole Sinatra, Bassell suggested ordering Chinese food.  He then walked up behind Ms. Murphy, leaned over her shoulder and began rubbing her back, repeatedly touching the band of her bra.  Bassell's touching was unwelcome and unwanted.

159.    As Bassell inappropriately rubbed Ms. Murphy's back, he brought his lips up to her ear and said that he wanted to order "suck me yum soup" from the Chinese restaurant.  He then repeated the offensive phrase "suck me yum, suck me yum" *many times* directly into Ms. Murphy ear while he laughed.

160. Ms. Murphy froze, terrified and disgusted by Bassell's behavior. She could feel his lips on her ear as he repeated "suck me yum," and it caused her to panic. First, Ms. Murphy experienced a tingling sensation, like pins and needles, from head to toe. Then, she began shaking and felt extremely cold.

161. A co-worker, noticing that Ms. Murphy was in a state of distress, came to her aid by distracting Bassell. Ms. Murphy then fled to her office where she quickly closed her window, locked the door, and sat on the floor, hyperventilating and sobbing. She tried to not to cry loudly enough for anyone to hear.

162. Within a few days, Ms. Murphy, along with Ms. Sinatra, Ms. Remetz, and other faculty members who were present at the meeting, reported the incident to the same UFT Chapter Leader Ms. Murphy had spoken to before.

163. The UFT Chapter Leader informed Ms. Murphy and the other women that this was not the first report against Bassell. She then stated in a matter-of-fact manner that Bassell was "Teflon Don" because "nothing sticks to him." She told Ms. Murphy that if she reported the incident, it would come down to a battle, but "at least [she would] go down swinging."

164. Ms. Murphy, terrified of being denied tenure and having Bassell derail her promising career, did not file a formal complaint. She then experienced the same symptoms from the day before: her body shook, she felt cold, and she couldn't speak. Her companions protested, telling the UFT Chapter Leader that the situation was grossly unfair. Disheartened, they left the meeting with the UFT Chapter Leader.

165. In May 2025, shortly after Ms. Murphy learned that she had received tenure, Bassell knocked on her office door while she was meeting with a student. Ms.

26

Murphy came out into the waiting room to speak with Bassell, who congratulated her on making tenure and gave her a hug while rubbing her back up and down with his hands in an inappropriate manner.  Ms. Murphy tried to end the hug a number of times, but Bassell repeatedly grabbed her and pulled her back in despite her clear discomfort.  Bassell's hugs lasted for minutes.

166.     A student sitting in the waiting room witnessed this incident and found it so coercive that he asked Ms. Murphy if she was okay and whether this was normal behavior for Bassell.

167.     Bassell's harassment, and the DOE's cover-up of it, had deeply adverse impacts on Ms. Murphy, emotionally and physically.  Ms. Murphy is a survivor of sexual abuse and struggled with an eating disorder as a teenager.  Bassell's unwanted touching triggered memories of the sexual abuse she experienced as a child and reignited her past struggles with her eating disorder, thus retraumatizing Ms. Murphy.

168.     As a result of the stress she was facing at work related to Bassell's unwanted physical touching and comments, Ms. Murphy began to experience physical symptoms including cold sores and migraines.

169.     Bassell continued to sexually harass and retaliate against Ms. Murphy until his arrest in late May 2025.

170.     Prior to learning of Bassell's arrest in late May 2025, Ms. Murphy was not aware of the extent of Bassell's harassment and retaliation and was also not aware of the DOE's efforts to protect Bassell.  In late May 2025, Ms. Murphy became aware that the DOE maintains a policy and practice of allowing Bassell to sexually harass, assault, and retaliate

27

against female students and faculty and of silencing the women and girls who are brave enough to report his illegal behavior.

### E. Ms. Murphy Faces Retaliation from the DOE After Filing this Lawsuit.

171.    On August 29, 2025, the original complaint in this case was filed. *See* ECF No. 1.

172.    Several media outlets, including the *New York Post* and the *Daily News*, published articles about the allegations. Ms. Murphy had no direct involvement with the articles.

173.    On September 3, 2025, just five days after the instant case was filed, Ms. Murphy attended a UFT meeting at AAS.

174.    During the meeting, the UFT Chapter Leader, a DOE employee who works as a teacher at the Academy, made a joke about Bassell "slurping soup."

175.    The soup reference was gratuitous and irrelevant to the meeting. It was a not-subtle allusion to the soup-related sexual comments that Bassell made to Ms. Murphy in March 2024—specifically, his grossly inappropriate request, which he whispered in Ms. Murphy's ear, to order "suck me yum soup."

176.    When the Chapter Leader referenced Bassell "slurping soup," many people in the room laughed and looked directly at Ms. Murphy.

177.    Ms. Murphy was deeply humiliated. Bassell's harassing and sexually inappropriate comment had previously triggered her past trauma and eating disorder. On September 3, her colleagues, led by her UFT representative, were laughing at that trauma.

178.    After the UFT meeting, the Chapter Leader confronted Ms. Murphy about the civil lawsuit. She asked Ms. Murphy a series of questions about the case and about the

28

articles that had been published in the media.  Ms. Murphy repeatedly responded that she could not speak about the case and was represented by counsel.

179.    The Chapter Leader persisted in asking her questions about the case, demanding to know who spoke with the news media.

180.    Ms. Murphy attempted to change the subject and asked the Chapter Leader why she had raised the issue of Bassell slurping soup.  The Chapter Leader feigned ignorance, calling her reference to soup a "coincidence."

181.    The Chapter Leader then returned to the subject of the lawsuit, despite the fact that Ms. Murphy had repeatedly told her she could not discuss it.

182.    The Chapter Leader, unprompted, confirmed that she had previously told Ms. Murphy that Bassell "is known to retaliate" against employees who complain about him. She defended her actions by saying that she was simply "being honest" with Ms. Murphy.

183.    The Chapter Leader then admitted to having known about Bassell's misconduct for years, or perhaps even decades.  She said:

> I remember you coming to us. I remember you telling that he would take advantage of your lunch periods and things like that. I remember people were uncomfortable with the climate. We had that conversation all the time. And yes, I said, 'He's a Teflon Don because nothing ever sticks to him.' That's a reality. I heard that from Long Island City…goes way back to that.

184.    Long Island City is a reference to LIC High School, the DOE public school where Bassell was principal for many years before he assumed the principalship at AAS.

185.    During the discussion, the Chapter Leader falsely accused Ms. Murphy of throwing her "under the bus" and dragging her name through the mud.

186.    The Chapter Leader concluded the conversation by warning Ms. Murphy:

"I also have attorneys, and I'm not pleased with this."

187.    It was clear to Ms. Murphy that the Chapter Leader was trying to intimidate her.

188.    The Chapter Leader's remarks caused Ms. Murphy to feel intimidated, threatened, and harassed.

V.    **VERA REMETZ'S FACTUAL ALLEGATIONS**

   A. **Bassell Sexually Harrasses, Assaults, and Retaliates Against Ms. Remetz at LIC High School**

189.    Prior to working at AAS, Ms. Remetz worked as a Guidance Counselor at LIC High School.

190.    Bassell hired Ms. Remetz to work at LIC High School in 2004.

191.    Immediately after Ms. Remetz began working at LIC High School, Bassell began calling her to his office constantly for unnecessary meetings. Once there, he would touch and rub her shoulders without her consent. If Ms. Remetz was wearing a dress or skirt, he would also touch and grope her upper thigh. Bassell also gave Ms. Remetz unwelcome backrubs and long, unwanted hugs during which he would tremble and rub her back and the side of her armpits.

192.    In 2006 or 2007, while in a meeting with Bassell, an Assistant Principal, and the Assistant Principal's secretary, Bassell asked Ms. Remetz, "does the carpet match the drapes?" Ms. Remetz took this to be a question about her pubic hair. She was horrified and embarrassed and quickly left the meeting.

193.    At her breaking point, Ms. Remetz confided in several colleagues about the harassment and abuse she faced from Bassell. These colleagues warned Ms. Remetz not to report Bassell because Bassell was known to retaliate against anyone who complained.

30

194.    Undeterred, Ms. Remetz reported Bassell's inappropriate behavior to her Union Representative, Kenny Achiron, who also had a long-standing friendship with Bassell. Mr. Achiron immediately began questioning Ms. Remetz's story, asking her if she was "really sure" about the accuracy of her account.  Ms. Remetz insisted that she was telling the truth, but her report did not lead to any corrective action.

195.    Instead, not long after her report, Bassell retaliated against Ms. Remetz by moving her to another Department on the fifth floor where she was secluded from her usual co-workers.

196.    However, up until Bassell left to work at AAS in 2011, he still occasionally called Ms. Remetz to his office where he would ask her how her new department was doing while touching and groping her without her consent on her arms and legs.

**B. Bassell Offers Ms. Remetz a Job, then Rescinds the Offer.**

197.    Ms. Remetz was hired by Bassell in June 2021 to work at the Academy as a Guidance Counselor.  She still holds that position.

198.    Prior to June 2021, Ms. Remetz worked at a different school and was very unhappy there.

199.    For years, Bassell had asked Ms. Remetz to transfer to his school.

200.    When Ms. Remetz applied for a position at the Academy, she disclosed to Bassell that she was desperate to leave her position.

201.    Bassell made an offer of employment to Ms. Remetz in June 2021.  She accepted and resigned her position at the other school where she had been working.

202.    After accepting the position, Ms. Remetz was added to a listserv with

other Academy teachers and staff.  She began receiving emails through this listserv, including announcements concerning the upcoming school year.

203.    After receiving the job offer, during the summer of 2021, Ms. Remetz informed Bassell that she was pregnant, with a due date in early 2022.

204.    Soon thereafter, Bassell retracted Ms. Remetz's offer of employment, vaguely claiming there was an "issue with the paperwork."

205.    Bassell then sent an announcement on the listserv (which Remetz was still on) stating that the Academy had hired a different Guidance Counselor.

206.    The other Guidance Counselor who was hired was not pregnant at the time.

207.    Ms. Remetz later learned that Bassell had told the other Guidance Counselor that he was able to hire her because another employee was pregnant.

208.    Upon hearing that her offer of employment was rescinded and another person had been hired, Ms. Remetz suffered a panic attack.  Pregnant and with no job, Ms. Remetz was in a state of great anxiety.  She collapsed on the floor and began hyperventilating.

209.    Ms. Remetz knew that her prior school had already hired a replacement, so she could not return there.  She felt hopeless and afraid.

210.    Ms. Remetz protested Bassell's decision, telling him that the rescission of her offer was causing her great stress.

211.    Bassell then reversed course and re-hired Ms. Remetz.  Bassell blamed one of his Assistant Principals for the alleged error.

212.    Ms. Remetz began working at the Academy in September 2021.

32

### C. Bassell Gropes and Kisses Ms. Remetz Without her Consent.

213. Bassell frequently subjected Ms. Remetz to unwanted touching on intimate parts of her body and unwelcome sexual remarks.

214. For example, in November of 2021, when Ms. Remetz was in the third trimester of her pregnancy, Bassell sat down next to Ms. Remetz, made a reference to Ms. Remetz's body, and then grazed her pregnant belly with his hand and rubbed her thigh.

215. Bassell often wanted to discuss sex, whether he was asking Ms. Remetz questions about her personal life or commenting on the sex lives of AAS students.

216. Bassell would frequently ask Ms. Remetz for information and details on private and personal information divulged by students during their counseling sessions with her.

217. Bassell spent a great deal of time in the office suite where the Academy's Guidance Counselors work. There was a couch in a central location in the office suite.

218. If Ms. Remetz was sitting on the couch, Bassell would sit next to her and grope her thigh without her permission.

219. Bassell groped and rubbed Ms. Remetz's thigh innumerable times between Spring 2022 and October 2024.

220. When Ms. Remetz wore a top without sleeves, Bassell would slowly caress her upper arm without her consent.

221. In short, Bassell would use any opportunity possible to stoke, graze, or grope any part of Ms. Remetz's body. Bassell never asked for permission.

222. Bassell would also touch Ms. Remetz when she was working in her office. Bassell would approach her desk, lean into her personal space, and ask what was on her

33

computer. It was obvious to Ms. Remetz that Bassell was feigning interest in her computer in order to be physically close to her.

223. Between Spring 2022 and October 2024, Bassell frequently gave Ms. Remetz tight and lingering hugs, during which Bassell blatantly pressed his body against Ms. Remetz's breasts and squeezed the sides of her breasts while hugging her. These hugs were unwelcome, unwanted, and made Ms. Remetz feel very uncomfortable.

224. In approximately Fall 2023, while Bassell was hugging Ms. Remetz tightly, he attempted to kiss Ms. Remetz on the lips. She turned her face away and Bassell's lips touched the corner of Ms. Remetz's mouth. She was disgusted.

225. On other occasions, during weekly meetings, Bassell would rub Ms. Remetz's foot and leg with his foot if she was sitting close to him.

226. Ms. Remetz never consented to any of Bassell's touching.

227. Ms. Remetz developed strategies to avoid Bassell's unwanted touching.

228. For example, in her office she moved her furniture to create physical barriers near her desk so Bassell could not approach her and lean into her personal space.

229. Ms. Remetz also avoided leaving her office, often not going to the bathroom, in order to avoid interactions with Bassell in the hallway for fear of unsolicited hugs, touching, or other forms of harassment. When Ms. Remetz did leave her office, she often tried to leave with a colleague or a student so she would not be alone in case Bassell approached her.

230. Ms. Remetz also attempted to sit far away from Bassell during staff meetings, because he would touch and grope whoever was sitting next to him.

231. Bassell's harassment was also verbal. Starting in approximately Fall 2021

34

and continuing through October 2024, Bassell frequently disparaged Ms. Remetz's husband, saying "he's not giving you enough" and "he needs to step up." These comments were unwelcome and also untrue.

232.     In 2024, when Ms. Remetz told Bassell she was pregnant with another child, Bassell asked if she had planned the pregnancy and inquired about her sex life. The question was unwelcome and harassing.

233.     Although Ms. Remetz fears retaliation for participating in this action, she has placed aside those fears in order to stand up for her rights.

### D.  Bassell Harasses Ms. Remetz While She is Pumping Breastmilk at Work.

234.     Ms. Remetz gave birth in January 2022 and took maternity leave.

235.     When Ms. Remetz returned to work from maternity leave, she needed to pump breastmilk every few hours.

236.     Bassell frequently entered Ms. Remetz's office, without knocking and without permission. He even entered when Ms. Remetz was in the middle of counseling sessions with students.

237.     The Academy does not have a designated space for women to pump breastmilk at work. Ms. Remetz thus pumped in her own office, doing her best to ensure her privacy and discretion.

238.     Ms. Remetz informed Bassell of her pumping plan: she said that when she is pumping, she will close and lock her office door and will place a screen over her window. She said she would also place a sign on the door indicating she should not be disturbed.

239.     Ms. Remetz told this to Bassell because it was her normal practice to keep her door unlocked and she wanted Bassell to understand why her door would be closed and

35

locked at certain times. She also knew that Bassell frequently entered her office, even when the door was closed.

240. Bassell said that Ms. Remetz's pumping plan was fine and that she should do what she needed to do in order to pump.

241. One day in the Spring of 2022, while Ms. Remetz was pumping breastmilk with her door closed and locked and the screen over the window, she heard someone trying to open the door by turning the doorknob.

242. Ms. Remetz then heard the jangling of keys.

243. Bassell unlocked the door and barged into Ms. Remetz's office without knocking and without asking for permission.

244. Ms. Remetz, who was wearing a breast pump, quickly darted under her desk so the intruder would not see intimate parts of her body.

245. Bassell knew Ms. Remetz was pumping because her door was closed and locked and the screen was covering her window.

246. Upon entering the room, Bassell asked Ms. Remetz, "Are you expressing?"

247. Ms. Remetz, still wearing the whirring breast pump and hiding under her desk, exclaimed that her door was locked, which means she is in the middle of pumping.

248. Bassell, feigning ignorance, asked, "How was I supposed to know?"

249. Ms. Remetz responded, in sum and substance, that he should know because her door was locked and that was the protocol.

250. Ms. Remetz further told Bassell that he should not be in her office while she is pumping.

36

251.     Bassell did not leave the office.  Instead, he responded indignantly that he has the right to enter any office at any time.

252.     When Ms. Remetz told him he should have at least knocked first, he responded that he does not have to knock.

253.     Ms. Remetz was shaken from this encounter.  She was uncomfortable knowing Bassell might have seen intimate parts of her body and upset that he had berated her.

254.     Ms. Remetz was also upset because she sensed that Bassell derived gratification from knowing that Ms. Remetz's body was exposed and that she was expressing breastmilk.

255.     Furthermore, because Bassell insisted that he was entitled to enter any room at any time without knocking, Ms. Remetz felt no safety or privacy.  Ms. Remetz became terrified that Bassell would continue to enter the room unannounced while she was pumping.

256.     Soon thereafter, Ms. Remetz became so anxious about pumping at work that she began to lose her milk supply.  Ms. Remetz consulted with a lactation consultant, who advised her to pump more often and alter her diet in order to increase her milk supply.

257.     Unfortunately, Ms. Remetz continued to face challenges with pumping and nursing for months, which caused her great anxiety and distress.

258.     She lost the ability to nurse her baby and began to use formula to supplement, which had not been part of her feeding plan.

259.     The terror and anxiety she experienced in 2022 returned a few years later, in the fall of 2024, when Ms. Remetz found that she was pregnant again.  As before, Ms.

37

Remetz became afraid Bassell would barge in while she was pumping and see her not fully clothed. She was afraid that she would have the same struggles as before and lose the ability to nurse her child due to the anxiety of pumping at work.

260. Prior to learning of Bassell's arrest in late May 2025, Ms. Remetz was not aware of the extent of Bassell's harassment and retaliation and was also not aware of the DOE's efforts to protect Bassell. In late May 2025, Ms. Remetz became aware that the DOE maintains a policy and practice of allowing Bassell to sexually harass, assault, and retaliate against female students and faculty and to silence the women and girls who are brave enough to report his illegal behavior.

**E. Ms. Remetz Performed Dozens of Hours of Unpaid Work.**

261. From 2022 through 2024, Ms. Remetz was frequently asked to perform tasks that were outside the scope of her required duties as a Guidance Counselor, in addition to all of her normal Guidance Counselor duties.

262. For example, in September and October in the years 2022, 2023, and 2024, Bassell directed Ms. Remetz to monitor students' attendance for the entire student body. This required Ms. Remetz to maintain a spreadsheet that she updated daily and to tabulate each student's absences.

263. Monitoring attendance for the entire student body is outside of the scope of Ms. Remetz's normal job duties and required her to perform an additional 30 minutes of work every day for two months, three years in a row, all of which was uncompensated.

264. In addition, in September, October, and November in the years 2022, 2023, and 2024, Bassell directed Ms. Remetz to track students' lunch forms, to call students' parents if the forms were not submitted, and to provide daily reports on her progress.

38

265.    Tracking lunch forms for the entire student body is outside of the scope of Ms. Remetz's normal job duties and required her to perform an additional 30 minutes of work every day for three months, three years in a row, all of which was uncompensated.

266.    From February 2023 to approximately April 2023, Ms. Remetz was asked by one of the APs to perform another attendance-related initiative.

267.    That AP, plus another AP who is in charge of the Academy's budget, approved the project and told Ms. Remetz that she would receive additional compensation for the work performed in connection with the project.

268.    Ms. Remetz performed the attendance-related task as directed, spending between three to five hours per week on the project outside of her normal working hours, for approximately three months.

269.    After Ms. Remetz performed the task, Bassell informed her that she would not be compensated for the extra work she performed.

270.    To date, Ms. Remetz has not been compensated for the additional hours of work she performed outside of her normal working hours.

## VI.    LESLIE KOHN'S FACTUAL ALLEGATIONS.

### A.    Bassell Begins Sexually Harassing Ms. Kohn Before her Official Start Date.

271.    In or around early June 2022, Ms. Kohn was hired as the Interim/Acting AP of Special Education and Arts at the Academy.[3]

272.    Ms. Kohn is a highly accomplished public servant with more than 15 years of experience as an educator.  She holds a master's degree in Educational Theater and

---

[3] Interim/Acting ("I/A") is an appointment within the DOE with the potential to become permanent if certain conditions and expectations are met.  I/A positions are inherently insecure, as the school's principal has the authority to terminate I/A employees at any time for any reason.

English from New York University and is certified as a School Building Leader, School District Leader, and in multiple instructional areas, including English, Theater, Music, and Students with Disabilities.

273.    Prior to joining the Academy in 2022, Ms. Kohn was a tenured educator at the Scholars' Academy, a New York City public school in Rockaway Park, Queens, where she served for a decade as Director of Theater Arts and taught English and Special Education to students in Grades 6–12.

274.    During her time as a teacher, Ms. Kohn has cultivated a reputation for consistently going above and beyond to support her students.  For example, at the Scholars' Academy, she established a Theater and Arts Department for Grades 6-12 and secured a six-figure grant from the DOE's Office of Arts and Special Projects to enhance school facilities.

275.    Ms. Kohn's first day of official work at the Academy was August 29, 2022.  However, between June 2022 and August 29, 2022, Bassell directed Ms. Kohn to work approximately twenty-four hours per week without pay in preparation for the upcoming school year.

276.    Bassell began behaving inappropriately toward Ms. Kohn almost immediately after she accepted the job offer.  For example, on June 6, 2022, when Ms. Kohn arrived at Bassell's office for a scheduled 1:1 meeting, Bassell subjected Ms. Kohn to a prolonged and inappropriate hug that caused her to feel violated and deeply uncomfortable. Then, after Ms. Kohn sat down next to him at his desk, Bassell stroked her arm without her permission. Ms. Kohn was shocked by his behavior and hoped it would not continue.

277.    On June 25, 2022, Bassell, Ms. Kohn's new supervisor, sent her a series of inappropriate text messages pressuring her to provide photographs of herself, including:

40

"Would love to see that outfit!!," "send a photo later!," "send a photo" and "You still owe me a photo." On July 1, 2022, Bassell further texted Ms. Kohn, comparing her to a parent of an AAS student and adding, "You are much better looking. And sexier, too, if I can say that." In response, Ms. Kohn sent a stop sign emoji in an effort to shut down the conversation.

278.    The following week, on July 7, 2022, during another 1:1 meeting in Bassell's office, Bassell again stroked Ms. Kohn's arm without her permission, while she sat next to him at his desk. During a phone conversation shortly thereafter, Bassell shockingly asked, "When was the last time you were with your husband?" Ms. Kohn refused to answer this unwelcome and harassing question.

279.    Despite feeling extremely uncomfortable with and disturbed by Bassell's behavior, Ms. Kohn refrained from confronting him for fear that it would affect her new position at the Academy. Becoming an Assistant Principal was an important step in Ms. Kohn's career as she aspired (and still aspires) to become a Principal one day and obtain her doctorate in educational leadership.

280.    Additionally, Ms. Kohn feared speaking out against Bassell because Bassell repeatedly made her aware that he held a powerful role within the Council of School Supervisors and Administrators ("CSA"), the union that represents Principals and APs. On more than one occasion, Bassell told Ms. Kohn that he was her union representative on the CSA and instructed her that if she ever had "any issues" with him, she should come directly to him.

281.    Throughout the rest of the summer, Bassell sent Ms. Kohn a number of text messages requesting that she work in person with him. However, Ms. Kohn always declined, preferring to work from home in order to avoid face-to-face contact with Bassell.

41

282.    Bassell also sent Ms. Kohn a barrage of inappropriate text messages, including repeated requests such as "May I send you a virtual hug and kiss," as well as statements like "You belong to me." Ms. Kohn rejected his advances and reiterated that she wished to maintain a professional relationship.

283.    At Bassell's request, Ms. Kohn continued to perform work-related tasks throughout the summer without compensation, including parent outreach, phone calls to other schools and DOE professionals, amending students' Individual Educational Plans ("IEPs"), addressing programming concerns, and managing complex student and parent issues.

284.    On August 29, 2022, Ms. Kohn's first official day of work according to DOE records and her paystubs, she was required to return to work in person. That day, Bassell entered her office, placed his hand on the right side of her neck, and stroked it while saying, "I came to bother you." Ms. Kohn immediately protested, asking him not to touch her, but Bassell ignored her. Bassell, still stroking her neck, replied, "I don't mind." Ms. Kohn then repeated: "Please don't touch me, I'm sweating," in an effort to stop the contact. She was left feeling violated, shaken, and sickened.

285.    Bassell's sexual misconduct only escalated from that point. During meetings in the conference room, sometimes 1:1 and other times with co-workers present, Bassell would frequently sit uncomfortably close to Ms. Kohn and stroke her arms without her consent or permission. This touching, which was always unwelcome, inappropriate, and served no purpose other than Bassell's sexual fulfillment, occurred dozens of times during the course of Ms. Kohn's employment with the Academy.

286.    On many occasions during Ms. Kohn's tenure at the Academy (at least

10), Bassell summoned her to his office and asked her to sit next to him so that he could allegedly show her something on his computer. During their conversations, Bassell would put his hand on her legs and grope her inner thighs. Bassell did this, unsolicited, without Ms. Kohn's permission or consent. Ms. Kohn was mortified, scared, disgusted, and angry about these unwanted physical touches.

287.    While Bassell sexually harassed Ms. Kohn, he never verbally acknowledged what he was doing; he just continued to speak to Ms. Kohn about school affairs as if the circumstances were completely normal. Ms. Kohn never wanted Bassell to touch her, but she feared speaking up against him because, as an I/A AP without tenure, Bassell had the power to terminate her employment at will.

288.    Whenever Ms. Kohn pulled her arms or legs away from Bassell to indicate that she was uncomfortable and that he should stop touching her, Bassell simply ignored Ms. Kohn's rejections and persisted in placing his hands on her body without her consent.

289.    Bassell also regularly commented on Ms. Kohn's physical appearance, telling her she was beautiful or stunning and also regularly remarked on her clothing.

290.    Bassell's text messages to Ms. Kohn—which were relentless in their frequency—ranged from inappropriate to pornographic.

291.    For example, on October 16, 2022, Bassell sent Ms. Kohn a series of sexually explicit text messages, asking whether she preferred "toy[s] or fingers or both?" He then directly asked Ms. Kohn how old she was when she lost her virginity, and remarked, "I imagine you take time." Ms. Kohn rebuffed these advances, making clear that she wished to maintain a professional boundary and stating that she would "never discuss private moments."

43

**B. Ms. Kohn Complains to the DOE Title IX Office, Which Fails to Protect Her.**

292.    On August 31, 2022, Ms. Kohn reached out to a former AP from her previous school—now serving in a different role within the DOE—regarding Bassell's unwelcome sexual advances and harassing behavior.  The former colleague informed Ms. Kohn that Bassell had a history of sexual harassment and advised her to report his conduct to the DOE's Title IX Liaison[4] or the Queens North High Schools Superintendent's Office.[5]

293.    Ms. Kohn quickly followed this advice and contacted the DOE's Title IX Attorney covering Queens County to report Bassell's harassing behavior.

294.    The Title IX Attorney, whose name Ms. Kohn does not recall, informed Ms. Kohn that she could file a complaint about Bassell's behavior with the DOE's Office of Equal Opportunity ("OEO").  The Title IX Attorney implied that Ms. Kohn's identity as a whistleblower would be revealed to Bassell if she chose to file a complaint.  The Title IX Attorney failed to inform Ms. Kohn that she had the option to file her complaint anonymously; that her complaint would be kept confidential; that the DOE maintains a strict no retaliation policy; that whistleblowers, like herself, are protected by law; and that if, in the future, she came to believe she was being subjected to retaliation, she should call back and report such retaliation.

295.    Ms. Kohn, terrified that Bassell would retaliate against her given his decades of experience at the DOE, his many connections within the agency, and his powerful

---

[4] The DOE's Title IX Liaisons are assigned to specific DOE districts and tasked with ensuring compliance with Title IX in their specific regions through implementing investigative procedures consistent with federal legislation and conducting investigations of Title IX complaints.

[5] All New York schools are overseen by superintendents.  New York City has 45 superintendents.   Dr. Hoa Tu is superintendent of Queens North High Schools ("Queens North"), the DOE school district in which the Academy of American Studies is located.

standing within the CSA, and unaware of the protections that whistleblowers are entitled to under law, did not file a formal complaint that day.

296.    In or around early December 2022, Ms. Kohn became a permanent AP at the Academy.  Even though Ms. Kohn no longer had I/A status, she still lacked tenure and the employment protections that come along with it.

297.    In or around mid-December 2022, Ms. Kohn confided in two of her co-workers, another AP and a Special Education teacher, about Bassell's harassment.  During both of these conversations, Ms. Kohn broke down in tears.  She had been holding back her pain, fear, and shame for months.  Both women were extremely empathetic towards Ms. Kohn's situation.  One of them even offered to sit in between Ms. Kohn and Bassell during meetings in order to create a physical barrier and to protect Ms. Kohn.

298.    Soon after Ms. Kohn disclosed this confidential information, Bassell entered Ms. Kohn's office and knowingly asked: "Are we okay?"  Ms. Kohn, concerned about upsetting Bassell and losing her position at the Academy, felt compelled to pretend there was nothing wrong.

299.    After this interaction, Bassell's behavior temporarily improved; he paused his weekly touching of Ms. Kohn's body and his inappropriate comments and text messages. Ms. Kohn was relieved.

300.    In or around April of 2023, Mr. Bassel resumed his unwanted and unwelcome touching of Ms. Kohn on a regular basis.

301.    Every week from April 2023 through June 2024, Bassell groped, stroked, caressed, or otherwise touched Ms. Kohn's body, including intimate body parts such as her inner thigh, without her consent or permission.

45

302.     Ms. Kohn was mortified and angry but also felt unable to make him stop.

303.     On or around July 10, 2024, after Bassell once again groped Ms. Kohn's inner thighs while she was working, she reached a breaking point.

304.     As a result of Bassell's ongoing harassment in the workplace, Ms. Kohn's mental and physical health deteriorated significantly. Beginning in April 2023, she sought weekly therapy to cope with the trauma. She suffered from severe anxiety and depression that manifested in abdominal pain, frequent shaking, excessive sweating, and persistent rumination over the situation and how she might resolve it. Ultimately, Ms. Kohn was prescribed psychiatric medication to alleviate her symptoms.

305.     During the summer of 2024, Ms. Kohn realized that the prospect of enduring regular unwanted groping for another school year was untenable. Ms. Kohn's physical and mental health simply could not withstand another year of Bassell's touching, texting, and sexual comments.

306.     Faced with no other choice, Ms. Kohn was forced to leave the position she had worked toward for years. She was also devastated to say goodbye to her many cherished colleagues and wonderful students she cared for deeply. When news of her departure spread, teachers sent messages such as, "Thank you for being the best AP I have ever had in my teaching career," "I will sincerely miss you. You have been one of the best bosses I have ever had (and I've had many)," and "I can't thank you enough for the work you've done for my growth." Others wrote, "I am so sad to see you go." Multiple teachers also wrote cards, and one gifted her a plaque that read "Difference Maker."

307.     Ms. Kohn accepted a non-administrative teaching position at a non-DOE public school in Long Island where she earned nearly $50,000 less annually than she earned

as an AP at the Academy.

308.    In accepting the non-DOE position, Ms. Kohn abandoned a steadily moving career trajectory with increased earnings and a respectable pension, but she was desperate to escape Bassell.

309.    On August 28, 2024, Ms. Kohn was forced to resign from the position of AP at the Academy.

310.    On September 4, 2024, during one of Ms. Kohn's last days of employment at the Academy, she took a sick day to visit her OBGYN.

311.    Soon thereafter, Ms. Kohn provided Bassell a note from her doctor to excuse her absence from work.  The note was written on paper from her physician's prescription pad. Bassell declared that the note "was not good enough" and demanded that Ms. Kohn provide a note on her doctor's letterhead.  When Ms. Kohn dutifully called her OBGYN to request the "appropriate note," the office informed her that the Academy had already contacted the OBGYN's office to confirm Ms. Kohn's appointment.

312.    Ms. Kohn, affronted by Bassell's intrusion into her personal health records, again called the DOE's Title IX Liaison to report Bassell's disturbing behavior. This time, she was determined to file a complaint.  However, the Title IX Attorney she spoke with claimed that Ms. Kohn was no longer allowed to file a report because the statute of limitations had expired.  This claim was false.

313.    Ms. Kohn involuntarily left her position at the Academy feeling discouraged and heartbroken that she had been unable to hold her abuser accountable, and deeply traumatized by the years of abuse she had endured.  Ms. Kohn's last day at the Academy was September 16, 2024.

47

**C. Ms. Kohn Reports Bassell's Sexual Harassment to the Superintendent's Office.**

314.    After teaching at a public school on Long Island during the 2024-2025 academic year, Ms. Kohn came to the conclusion that she missed serving as a school administrator and did not want to allow Bassell's misconduct to deter her from the career she had worked so hard to build.

315.    In mid-May 2025, Ms. Kohn thus began to apply for an AP position within the DOE again.

316.    Ms. Kohn needed a reference from a former supervisor as part of her application and did not feel comfortable asking Bassell.  She decided to ask the Superintendent in charge of Queens North.

317.    On May 17, 2025, Ms. Kohn contacted Superintendent Hoa Tu, stating that she was looking for a new AP position.  Superintendent Tu agreed to serve as a reference for Ms. Kohn and said she would share Ms. Kohn's resume with principals at various schools.

318.    A few days later, Ms. Kohn also reached out to Abigail Lovejoy, the Administrator of Special Education at Queens North, to let her know that she was seeking an AP position with the DOE again.

319.    Ms. Kohn specifically noted that she could not work for Bassell again. Ms. Kohn then disclosed Bassell's yearslong campaign of touching her in unwanted ways, sending her sexually explicit messages, and making unwelcome comments about sex.

320.    Ms. Lovejoy dutifully reported what Ms. Kohn told her about Bassell's sexual harassment to the Special Commissioner of Investigations ("SCI")[6] and to

---

[6] The Special Commissioner of Investigation ("SCI") is an independent watchdog agency tasked

Superintendent Tu.

321.    Superintendent Tu and Ms. Lovejoy recommended that Ms. Kohn file a complaint with the New York City Police Department ("NYPD").

322.    On Monday, May 26, 2025 (Memorial Day), Ms. Kohn, along with a former colleague, spoke with an NYPD Detective and told him about the history of Bassell's harassment and abuse.

323.    The next day, May 27, 2025, Bassell was arrested by the NYPD.

324.    Prior to reporting Bassell to the Superintendent's Office in May of 2025, Ms. Kohn was not aware of the extent of Bassell's harassment and retaliation and was also not aware of the DOE's efforts to protect Bassell.  In late May 2025, Ms. Murphy became aware that the DOE maintains a policy and practice of allowing Bassell to sexually harass, assault, and retaliate against female students and faculty and to silence the women and girls who are brave enough to report his illegal behavior.

325.    The Queens County District Attorney's Office charged Bassell with crimes stemming from his behavior toward Ms. Kohn and another Academy faculty member.

326.    Bassell has been charged with the following crimes: Forcible Touching, in violation of New York Penal Law ("NYPL") § 130.52-1 and five counts of Sexual Abuse in the Third Degree, in violation of NYPL § 130.55.

327.    The docket number of Bassell's criminal case is CR-019926-25QN.

328.    Bassell's next court date in Queens Criminal Court is May 1, 2026.

**D. Bassell's Retaliatory Imposition of a "Problem Code" on Ms. Kohn's File.**

329.    Ms. Kohn, while bravely serving as a complaining witness in the criminal

---

with investigating corruption and misconduct within the DOE.

49

case, continued to look for work as an AP in order to get her career back on track.

330. Yet, unbeknownst to her, Bassell had surreptitiously and unethically placed a significant obstacle in her way.

331. On June 13, 2025, Ms. Kohn was hired as the I/A AP of Supervision, Students with Disabilities at the High School of Art and Design. She was scheduled to begin work as a 12-month employee on July 1, 2025.

332. However, in July of 2025, the Principal of the High School of Art and Design informed Ms. Kohn that her start date had been significantly delayed because he had discovered a "Problem Code" on her file.

333. A Problem Code is an internal flag placed on a DOE employee's personnel file, effectively serving as a negative mark that warns school leaders and DOE central offices not to hire that individual.

334. Ms. Kohn soon learned that Bassell had placed the Problem Code in Ms. Kohn's file for alleged "inappropriate use of a sick day" on September 4, 2024. Bassell did this despite the fact that Ms. Kohn had provided him with two doctors' notes and there was nothing inappropriate about Ms. Kohn using a sick day to attend an appointment with her OBGYN.

335. Bassell's act of placing a Problem Code on Ms. Kohn's file was a clear act of retaliation, not a legitimate personnel matter. It is also yet another example of his gross abuse and misuse of his power as a school principal.

336. Because of the Problem Code Bassell placed on Ms. Kohn's file, the DOE struggled to clear the red tape necessary to hire Ms. Kohn, which delayed her start date to late August 2025.

337.     This delay cost Ms. Kohn significant lost wages and reduced her status from a 12-month employee to a 10-month employee for the 2025–2026 school year.

## VII. THE DOE HAS KNOWN ABOUT BASSELL'S SEXUAL HARASSMENT, ASSAULT, AND RETALIATION AGAINST FEMALE STUDENTS AND FACULTY FOR DECADES.

338.     Upon information and belief, the DOE knew that Bassell had sexually harassed, assaulted, and retaliated against women and girls in DOE schools as early as 2002.

339.     Before becoming Principal of AAS, Bassell served as LIC High School's Principal from the 1990s to 2011.

340.     Ann Craven worked as a teacher at LIC High School from 2002 to 2012.

341.     From the time Ms. Craven began working at LIC High School, she noticed that Bassell would routinely have his secretary call female students to his office over the school's PA system, just like he did with Ms. Leal leading up to and after her 2015 assault.

342.     Ms. Craven witnessed Bassell ogle LIC High School girls inappropriately for long periods of time.

343.     During her time at LIC High School, Ms. Craven also repeatedly saw Bassell leering at female employees, giving them long, unwanted hugs, and touching them without their consent on their shoulders, hands, upper legs, and lower backs.

344.     Upon information and belief, a number of women reported Bassell's behavior to other DOE employees who worked for the Union, but the reports did not result in any change in Bassell's behavior.

345.     One of these women, as set forth and detailed above, was Plaintiff Vera Remetz.

346.     Additionally, on June 4, 2020, an Instagram account called "AAS Takes a

Stand," was created.

347.    The account featured numerous posts detailing allegations from students who reported being harassed and assaulted by Bassell.

348.    For example, in one post, a student accused Bassell of repeatedly calling her out of class "to talk."  Bassell would then proceed to "rub [her] arms and thighs for 30 min[utes]."

349.    A number of students accused Bassell of staring at and manufacturing reasons to touch their breasts.  For instance, one student said that Bassell, after staring down her shirt for a while, pretended to trip over seemingly nothing and then proceeded to grab her waist and breast "harshly" to steady himself.  Another student wrote that, while checking IDs, Bassell would stop female students from entering the building by putting his hand on their chests even when their IDs were already clearly displayed.

350.    Upon information and belief, some of the accusations of sexual harassment and sexual assault made against Bassell on AAS Takes a Stand involved events that appear to have occurred prior to Bassell's 2015 assault of Ms. Leal.  For example, one student stated that, in 2015, Bassell had peeped at female students while they were in the restroom.  Another student alleged that years prior to her post, Bassell had stared at her chest multiple times, touched her and other female students on the arms and backs, and made inappropriate comments about her and her female classmates' bodies.

## VIII.    THE DOE FAILED TO PROPERLY TRAIN ITS EMPLOYEES ON SEXUAL HARASSMENT AND SEXUAL ABUSE, THUS ALLOWING BASSELL TO ENGAGE IN RAMPANT SEXUAL ABUSE, IN VIOLATION OF THE U.S. CONSTITUTION.

351.    In the years leading up to Bassell's sexual assault of Ms. Leal in 2015, the DOE knew to a moral certainty that its employees were regularly confronting situations in

which female students were subject to abuse and harassment.

352.    The DOE further knew that its employees would have to make difficult decisions and choices about how to properly identify and report the abuse and harassment, and that they required training on these important topics.

353.    Data from SCI reveals that, between 2011 and 2014, SCI received 2,388 complaints of sexual misconduct involving "employees, individuals, and companies associated with the New York City Department of Education."[7]

354.    In 2014, SCI received 582 complaints of sexual misconduct and substantiated 22.5% of these complaints.  Since 1991, at least ten complaints against DOE principals and other administrators have been substantiated.[8]

---

[7] *See* SCI 2011 Statistical Report (Jan. 4, 2012), https://www.nyc.gov/assets/doi/sci/releases/01-12-Statistics-2011.pdf (last visited Aug. 28, 2025); SCI 2012 Statistical Report (Jan. 8, 2013), https://nycsci.org/wp-content/uploads/2018/Public/01-13-Statistics-2012.pdf (last visited Aug. 28, 2025); SCI 2013 Statistical Report (January 7, 2014), https://nycsci.org/wp-content/uploads/2018/Public/01-14-STAT-REPORT-2013.pdf (last visited Aug. 28, 2025); SCI 2014 Statistical Report (January 8, 2015), https://www.nyc.gov/assets/doi/sci/releases/01-14-STATISTICS-REPORT-2014.pdf (last visited Aug. 28, 2025).

[8] *See* Press Release, SCI, School Principal Pleads Guilty to Sexual Abuse (Mar. 17, 1993) https://nycsci.org/wp-content/uploads/2018/Public/03-93-Friedman-Plea-Rel.pdf (last visited Aug. 28, 2025); Press Release, SCI, High School Dean Sexually Abused a 15-Year-Old Male Student (Jan. 31, 2001) https://nycsci.org/wp-content/uploads/2018/Public/01-01-Goldberg-Rel.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Edward Stancik to Chancellor Harold Levy (Jul. 20, 2001) https://nycsci.org/wp-content/uploads/2018/Reports/07-01-Ayed-letter-to-levy-LTR.pdf (last visited Aug. 28, 2025); Edward Stancik, *Report of the Special Commissioner of Investigation for the New York City: September 1, 1999-June 30, 2002* (Dec. 2003) https://nycsci.org/wp-content/uploads/2018/Reports/Annual-Report-1999-2002.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Joel Klein (Dec. 11, 2007) https://nycsci.org/wp-content/uploads/2018/Reports/12-07-Siegel-Lawrence-LTR.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Joel Klein (May 9, 2009) https://nycsci.org/wp-content/uploads/2018/Reports/05-09-Brown-Tyrone-Ltr.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Joel Klein (Jan. 6, 2010) https://nycsci.org/wp-content/uploads/2018/Reports/01-10-Cedeno-Quintin-Ltr.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Dennis

355.     There is also ample evidence that, prior to Bassell's sexual assault of Ms. Leal, New York City schools had a systemic problem with underreporting instances of sexual harassment and abuse.

356.     There are about 1.1 million students enrolled in DOE schools, and about 1.6 million enrolled in New York State schools outside of New York City.  During the 2013-2014 school year, the DOE reported only 454 material incidents of sexual and gender harassment while the rest of New York State reported 2,247 material incidents of sexual and gender harassment.  This means that, although New York City's population is approximately 43.44% of the State's overall population, it accounted for only 16.8% of the State's gender and sexual discrimination and harassment reports during the 2013-2014 school year.  These figures evidence pervasive underreporting signaling a systemic failure to identify, respond to, and prevent sexual harassment and assault.

357.     The New York Attorney General's Office launched an investigation into these disparities, culminating in a 2016 letter report.  The report concluded that there was "substantial underreporting of material incidents of harassment and discrimination by schools in New York City," and described staff training on harassment and discrimination as "sparse and inadequate."[9]

---

Walcott (Jul. 30, 2013) https://nycsci.org/wp-content/uploads/2018/Reports/07-13-Taylor-Malik-Ltr.pdf (last visited Aug. 28, 2025); Letter from Special Commissioner Richard Condon to Chancellor Dennis Walcott (Sept. 4, 2013) https://nycsci.org/wp-content/uploads/2018/Reports/09-13-Abreu-and-Martinez-Ltr.pdf (last visited Aug. 28, 2025); Ashley Southall, "New York City Schools Official Charged with Sexual Abuse," The New York Times (Jun. 17, 2015) https://www.nytimes.com/2015/06/18/nyregion/new-york-city-schools-official-charged-with-sexual-abuse.html (last visited Aug. 28, 2025).

[9] New York State Educ. Dep't and New York Office of the Att'y General, *Letter to District Superintendents on Dignity for All Students Act: Results of Statewide School District Survey and Guidance on Implementation 3* (Aug. 31, 2016) https://www.p12.nysed.gov/sss/documents/SED-AGLttrandGuidance8-31-16.pdf (last visited Aug. 29, 2025).

358.     The DOE therefore knew or should have known, long before Ms. Leal was assaulted by Bassell in 2015, that DOE staff required training on (1) how to recognize the signs and patterns of sexual harassment and abuse and (2) how to safely and effectively report potential sexual harassment and abuse.

359.     Yet despite the DOE's knowledge that sexual misconduct occurs in its schools and training is necessary in order to prevent it, employees at AAS did not begin to receive sexual harassment training until the spring of 2020.

360.     According to two AAS teachers who spent decades working for the Academy, the very first time faculty members received training on sexual harassment and sexual abuse was in 2020, just after the COVID-19 pandemic began.[10]

361.     These teachers recall that, after all DOE public schools switched to remote learning in March 2020, a number of AAS students began reporting that Bassell had inappropriately touched them, stared at their bodies, and made them feel uncomfortable in school.

362.     Upon information and belief, prior to June 2020, Academy teachers had not received sexual harassment training.

363.     Upon information and belief, prior to June 2020, Academy teachers were not trained on (1) detecting signs of sexual harassment or sexual abuse; or (2) how to report suspected sexual harassment or sexual abuse.

---

[10] One of the teachers is Ann Craven, who, after working as a teacher for LIC from 2002-2012, worked as a teacher for AAS from 2012 to 2023.  Thus, for approximately 21 years, Ms. Craven worked at schools where Bassell held the role of Principal.  The other teacher has worked at the Academy for the past 20 years and still works there now.  Because Bassell still holds the role of Principal, she prefers to not reveal her name for fear of retaliation.

364. Upon information and belief, Bassell intentionally withheld such training from AAS teachers prior to June 2020.

365. Upon information and belief, the DOE allowed Bassell to withhold sexual harassment and sexual abuse training from AAS teachers prior to June 2020.

366. Had teachers received training on detecting sexual abuse and how to report it in 2015, Ms. Leal's abuse could have been prevented or stopped.

367. Numerous AAS teachers have been aware for years that Bassell engages in inappropriate conduct.

368. For example, Ann Craven and other teachers, have witnessed Bassell leer at women's bodies.

369. Ms. Craven and other teachers have seen Bassell hugging women for uncomfortably long periods of time.

370. Ms. Craven and other teachers have seen Bassell touching women's bodies—including their shoulders, lower backs, and arms—during meetings.

371. Ms. Craven knew that Bassell would call students—always females—to his office and spend a long time talking to them when those students were supposed to be in class.

372. Ms. Craven knew Ms. Leal as a student in 2015 and 2016.

373. In 2015 and 2016, Ms. Craven did not receive any training relating to sexual harassment or sexual abuse. She did not received training related to sexual harassment or sexual abuse in years prior to 2015, either.

374. In 2015 and 2016, Ms. Craven was not trained on detecting signs of sexual harassment or sexual abuse. She did not received training related to detecting signs of sexual

harassment or sexual abuse in years prior to 2015, either.

375.    In 2015 and 2016, Ms. Craven was not trained on how to report suspected sexual harassment or sexual abuse.  She did not receive training related to how to report suspected sexual harassment or sexual abuse in years prior to 2015, either.

376.    Had Ms. Craven received training on detecting and reporting suspected sexual harassment or sexual abuse in or prior to 2015 or 2016, she would have reported Bassell's inappropriate behavior.

## IX.    THE DOE'S CONTINUED DELIBERATE INDIFFERENCE TO SEXUAL HARASSMENT AND SEXUAL ABUSE AFTER BASSELL'S ARREST.

377.    Bassell continues to hold the role of Principal of the Academy for American Studies, despite the fact that he has been arrested and is being prosecuted for sex crimes in connection with his treatment of two faculty members.

378.    Bassell continues to receive a salary from the DOE despite the criminal charges and numerous allegations against him.

379.    In May 2025, Ms. Kohn told Queens North Superintendent Hoa Tu about Bassell's yearslong campaign of harassment against her.

380.    On June 26, 2025, less than one month after Bassell's arrest and arraignment for his alleged misconduct against Ms. Kohn, Dr. Tu announced a new hire in the Queens North District team: Dr. Howie Kwait.

381.    Kwait was appointed Chief of Staff to the Superintendent and Director of Accountability for the Queens North District.

382.    Kwait's appointment into this role is troubling due to his history in the DOE.

383.    From 2006 to 2018, Kwait served as Principal of John Bowne High

School in Flushing, Queens.

384.     Kwait was accused of sexual harassment and discrimination by several different women in multiple lawsuits.

385.     The allegations against Kwait are shockingly similar to those against Bassell.

386.     For example, a DOE guidance counselor alleged in a civil suit that Kwait solicited her and female colleagues for threesomes, rubbed his body against her, and told her that if she achieved a high graduation rate, he would perform oral sex on her.  *See Prettitore v. N.Y.C. Dept. of Educ. et al.*, Case No. 1:16-cv-06221-NGG-CLP (E.D.N.Y.).

387.     In another case, an Assistant Principal accused Kwait of making unwanted sexual advances, straddling her body, and simulating sexual intercourse.  *See Catenacci v. N.Y.C. Dept. of Educ. et al.*, Case No. 1:14-cv-06987-RJD-JO (E.D.N.Y.).

388.     In another case, an English teacher alleged that Kwait harassed her when she got pregnant, then retaliated against her after she complained about discrimination.  *See Maya* v. *N.Y.C. Dept. of Educ. et al.*, Case No. 1:14-cv-06986-RJD-JO (E.D.N.Y.).

389.     Another Assistant Principal accused Kwait of bullying her after he learned she was pregnant; that case survived summary judgment.  *See Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ.*, 866 F. Supp. 2d 147 (E.D.N.Y. 2011).

390.     The DOE settled each of the cases against Kwait pre-trial for a combined total of at least $830,000.

391.     In 2018, after then-DOE Chancellor Richard Carranza reviewed the allegations, he reassigned Kwait to the DOE central office.

392.     At the time Kwait was reassigned, a DOE spokesperson stated: "After a

thorough review of the details of Mr. Kwait's cases, the Chancellor decided to reassign him to a central office where he will be closely supervised and will no longer be permitted to manage other employees."[11]

393.    The statement continued: "Schools must be safe, welcome and inclusive environments for all students and staff, and we will do everything in our power to hold employees accountable for meeting these standards."[12]

394.    Now, only 8 years after the DOE reassigned Kwait and promised he would be closely supervised and not permitted to manage other employees, Kwait has been given a high-ranking position within Queens North, the district that oversees the Academy for American Studies, where the principal stands accused of sexual assault and sexual harassment.

395.    As Chief of Staff, Kwait is managing other employees: he gives assignments and instructions to DOE employees; he trains DOE employees on how to do their jobs; and he imposes discipline on DOE employees who fail to do their jobs.

396.    Upon information and belief, as Director of Accountability, Kwait is tasked with ensuring that individuals employed by the DOE are held accountable for their actions.

---

[11] *See* Susan Edelman, *Principal Accused of Sexual Harassment by 4 Women Reassigned*, NEW YORK POST, (May 11, 2018), https://nypost.com/2018/05/11/principal-who-cost-city-830k-in-settlements-reassigned/; Jeffery C. Mays, *Queens Principal Reassigned After Harassment and Discrimination Lawsuits Totaling $600,000*, N.Y. TIMES (May 12, 2018), https://www.nytimes.com/2018/05/12/nyregion/queens-principal-sexual-harassment.html; Carlotta Mohamed, *John Bown High School Principal Reassigned After Four Harassment Lawsuits*, QNS (May 18, 2018), https://qns.com/2018/05/john-bowne-high-school-principal-reassigned-after-four-harassment-lawsuits/.

[12] *Id.*

397.     One of the duties of a school district superintendent is to "supervise and evaluate school principals."[13]

398.     The superintendent's staff, including her Chief of Staff, assists the superintendent in carrying out her many duties.

399.     The superintendent's staff, including her Chief of Staff, is thus at least partially responsible for supervising and evaluating school principals.

400.     It is grossly inappropriate for Kwait, who was accused of sexually harassing numerous women leading to his removal as a DOE principal, to supervise and evaluate Bassell, who has been accused of sexually harassing numerous women.

401.     The DOE's willingness to place Kwait in his current role is further evidence of its deliberate indifference to the constitutional rights of its female employees and students.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
Violation of the Equal Protection Clause – Persistent & Widespread Practice
48 U.S.C. § 1983
(By All Plaintiffs Against All Defendants)

402.     Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

403.     Defendant DOE had and has an informal policy or custom of tolerating sexual abuse and sexual harassment by its principals, including Principal Bassell, in violation of Plaintiffs' constitutional rights.

404.     Defendant Bassell, an agent of Defendant DOE, engaged in a persistent

---

[13] *See* https://www.schools.nyc.gov/about-us/leadership/district-leadership (last visited Sept. 25, 2025).

practice of constitutional violations by groping, touching, and stroking the bodies of women and girls without their consent.

405.    Defendant Bassell, an agent of Defendant DOE, engaged in a persistent practice of constitutional violations by making lewd, graphic, and inappropriate sexual comments to women without their consent.

406.    Defendant Bassell, an agent of Defendant DOE, engaged in a persistent practice of constitutional violations by sending vulgar and sexual text messages to women without their consent.

407.    The DOE was and is aware of and deliberately indifferent to this pattern and practice of constitutional violations.

408.    When Plaintiffs reported Bassell's inappropriate and harassing behavior to the DOE, nothing was done to stop Bassell's conduct.

409.    The DOE protected Defendant Bassell by failing to stop his harassing conduct.

410.    Plaintiffs did not know this was a persistent and widespread practice until after May 27, 2025, the date when Defendant Bassell was arrested.  After May 27, 2025, it became public knowledge that Defendant had been engaging in this pattern of behavior for years and that the DOE had been protecting him the whole time.

411.    Even after May 27, 2025, the DOE has continued to exhibit deliberate indifference to the rights of women who work at the Academy and girls who attend the Academy by, *inter alia*, continuing to employ Bassell; continuing to pay Bassell; allowing Bassell to maintain the title of Principal of AAS; and by placing Howard Kwait, a former principal who was accused of sexual harassment by numerous female employees and

removed from his principalship based on those accusations, in a position of power over the Academy in his role as Chief of Staff and Director of Accountability at Queens North, the DOE district office that oversees the Academy.

412.     As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs have suffered, and continue to suffer, substantial monetary and psychological damages.

## SECOND CAUSE OF ACTION
Violation of the Equal Protection Clause – Failure to Train
48 U.S.C. § 1983
(By Plaintiff Leal Against Defendant DOE)

413.     Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

414.     Defendant DOE knew that its employees, including teachers at AAS, were confronting and would continue to confront situations in which female students were subject to abuse and harassment.

415.     Defendant DOE knew that its employees, including teachers at AAS, would have to make difficult decisions and choices about how to properly identify and report the abuse and harassment.

416.     Despite this knowledge, Defendant DOE failed to provide adequate training to its employees on identifying sexual harassment or sexual abuse of minors in the years that Ms. Leal was a student at AAS.

417.     Defendant DOE also failed to provide adequate training to its employees on how to report suspected sexual harassment or sexual abuse of minors in the years that Ms. Leal was a student at AAS.

418.     Defendant DOE's decision not to properly train its employees to identify

and report the sexual abuse and harassment of minors will frequently cause the deprivation of female students' right to equal protection under the law.

419.    Defendant DOE's failure to properly train employees to identify and report the sexual abuse and harassment of minors caused Plaintiff Leal to be deprived of her right to equal protection under the law.

420.    If not for Defendant DOE's failure to train its employees, an AAS employee may have identified Ms. Leal as a victim of sexual abuse and harassment sooner or identified Defendant Bassell as a perpetrator before he had the chance to assault Ms. Leal.

421.    Ms. Leal was unaware of the DOE's failure to train its teachers on identifying and reporting sexual harassment and sexual abuse until May 29, 2025.

422.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered, and continues to suffer, substantial damages.

## THIRD CAUSE OF ACTION
Violation of the Equal Protection Clause – Gender Discrimination
48 U.S.C. § 1983
(By Plaintiffs Kohn, Remetz, and Murphy Against All Defendants)

423.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

424.    At all relevant times, Plaintiffs Kohn, Remetz, and Murphy were employed by Defendant DOE and Defendant Bassell served as their supervisor.

425.    Defendants intentionally and willfully discriminated against Kohn, Remetz, and Murphy in the terms and conditions of their employment because of their sex, subjected them to sexual harassment, and created a hostile work environment, in violation of the Equal Protection Clause of the U.S. Constitution.

426.    Defendant Bassell directly participated in, aided and abetted, and

63

otherwise condoned the sexual harassment and discrimination against Plaintiffs Kohn, Remetz, and Murphy on the basis of their sex.

427.    Defendant DOE condoned and endorsed the sexual harassment and discrimination perpetrated against Plaintiffs Kohn, Remetz, and Murphy on the basis of their sex.

428.    The sexual harassment that Plaintiffs Kohn, Remetz, and Murphy suffered was unwelcome, unwanted, and rejected by Plaintiffs.

429.    The sexual harassment that Plaintiffs Kohn, Remetz, and Murphy suffered while employed at the Academy severely affected the terms and conditions of their employment.

430.    As a direct and proximate result of said unlawful employment practices, Plaintiffs have suffered damages.

**FOURTH CAUSE OF ACTION**
Violation of the Equal Protection Clause – Retaliation
48 U.S.C. § 1983
(On Behalf of Plaintiffs Leal, Kohn, Sinatra, and Murphy Against Defendant DOE)

431.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

432.    Plaintiffs Leal, Kohn, Sinatra, and Murphy engaged in protected activity by opposing gender discrimination and sexual harassment by Defendant Bassell.

433.    Defendants ignored Plaintiffs' complaints about sexual harassment and gender discrimination and refused to remedy the problems.

434.    Defendants retaliated against Plaintiff Leal by intimidating her, threatening to not write her a letter of recommendation for college, and silencing her after she complained that Bassell had sexually assaulted her, in violation of her statutory and

64

constitutional rights.

435.    Defendants retaliated against Plaintiff Kohn by constructively terminating her employment and by imposing a Problem Code on her DOE file after she complained about sexual harassment and gender discrimination, in violation of her statutory and constitutional rights.

436.    Defendants retaliated against Plaintiff Murphy by spreading false rumors about her, ignoring her work-related requests, threatening to deny her tenure, and harassing and intimidating her after this lawsuit was filed, in violation of her statutory and constitutional rights.

437.    Defendants retaliated against Plaintiff Sinatra by blaming her for issues that were not her fault, being overly critical of her work, writing her up for infractions that other employees were not disciplined for, and excluding her from important work meetings, in violation of her statutory and constitutional rights.

438.    As a result of Defendants' conduct, Plaintiffs have suffered economic damages and extreme emotional distress damages.

**FIFTH CAUSE OF ACTION**
Violation of Title IX – Discrimination on the Basis of Sex
20 U.S.C. § 1681
(On Behalf of Plaintiffs Leal, Kohn, Remetz and Murphy Against Defendant DOE)

439.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

440.    The Academy of American Studies is an educational institution run and operated by the DOE that receives federal financial assistance.

441.    The DOE discriminated against Plaintiffs Leal, Kohn, Remetz, and Murphy in violation of Title IX, as detailed in the allegations above.

65

442.    As a result of Defendant's conduct, Plaintiffs have suffered damages.

**SIXTH CAUSE OF ACTION**
Violation of Title IX – Retaliation
20 U.S.C. § 1681
(On Behalf of Plaintiffs Leal, Kohn, Sinatra, and Murphy Against Defendant DOE)

443.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

444.    The Academy of American Studies is an educational institution run and operated by Defendant DOE that receives federal financial assistance.

445.    The DOE retaliated against Plaintiffs Leal, Kohn, Sinatra, and Murphy after they complained about discrimination in violation of Title IX.

446.    As a result of Defendant's conduct, Plaintiffs have suffered damages.

**SEVENTH CAUSE OF ACTION**
Violation of Title VII – Discrimination on the Basis of Sex
42 U.S.C. § 2000e et seq.
(On Behalf of Plaintiffs Kohn and Murphy Against Defendant DOE)

447.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

448.    As women, Plaintiffs are members of a protected class.

449.    Plaintiffs are and were qualified for their positions at AAS.

450.    Plaintiffs satisfactorily performed the duties required by their positions at AAS.

451.    Defendant DOE discriminated against Plaintiffs Kohn and Murphy in the terms and conditions of their employment on the account of their sex in violation of Title VII.

452.    Plaintiff Kohn was constructively discharged from her position at AAS

under circumstances giving rise to an inference of unlawful discrimination on the basis of her sex.

## EIGHTH CAUSE OF ACTION
Violation of Title VII – Retaliation
42 U.S.C. § 2000e et seq.
(On Behalf of Plaintiffs Kohn and Murphy Against Defendant DOE)

453.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

454.    The DOE retaliated against Plaintiffs Kohn and Murphy after they complained about discrimination in violation of Title VII.

455.    As a result of Defendant's conduct, Plaintiffs have suffered damages.

## NINTH CAUSE OF ACTION
Violation of the NYCHRL – Discrimination on the Basis of Gender
N.Y.C. Admin. Code § 8-107
(On Behalf of Plaintiffs Kohn, Murphy, and Remetz Against Defendant Bassell)

456.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

457.    At all relevant times, Plaintiffs Kohn, Murphy, and Remetz were employed by Defendant DOE and Defendant Bassell served as their supervisor.

458.    Defendant Bassell intentionally and willfully discriminated against Plaintiffs Kohn, Murphy, and Remetz in the terms and conditions of their employment because of their sex, subjected them to sexual harassment, and created a hostile work environment in violation of the NYCHRL.

459.    Defendant Bassell's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to the statutorily protected rights of Plaintiffs Kohn, Murphy, and Remetz.

67

460.    As a result of Defendant Bassell's conduct, Plaintiffs have suffered damages.

## TENTH CAUSE OF ACTION
Violation of the NYCHRL – Retaliation
N.Y.C. Admin. Code § 8-107
(On Behalf of Plaintiff Kohn Against All Defendants and on Behalf of Plaintiffs Murphy and Sinatra Against Defendant Bassell)

461.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

462.    Plaintiffs Kohn, Murphy, and Sinatra opposed Defendants' sexual harassment and other forms of discrimination against individuals on the basis of their sex.

463.    Defendants retaliated against Plaintiffs Kohn, Murphy, and Sinatra in the terms and conditions of their employment because of Plaintiffs' opposition to Defendants' sexual harassment and discrimination, in violation of the NYCHRL.

464.    As a result of Defendants' conduct, Plaintiffs have suffered damages.

## ELEVENTH CAUSE OF ACTION
Violation of the NYSHRL – Discrimination on the Basis of Gender
N.Y. Exec. Law § 296
(On Behalf of Plaintiffs Kohn, Remetz, and Murphy Against Defendant Bassell)

465.    Plaintiff realleges as if fully set forth herein the allegations contained in the preceding paragraphs.

466.    At all relevant times, Plaintiffs Kohn, Remetz, and Murphy were employed by Defendant DOE and Defendant Bassell served as their supervisor.

467.    Defendant Bassell intentionally and willfully discriminated against Plaintiffs Kohn, Remetz, and Murphy in the terms and conditions of their employment because of their sex, subjected them to sexual harassment, and created a hostile work environment in violation of the NYSHRL.

468.    Defendant Bassell's conduct was outrageous and malicious, was intended to injure, and was done with reckless indifference to the statutorily protected rights of Plaintiffs Kohn, Remetz, and Murphy.

469.    As a result of Defendant Bassell's conduct, Plaintiffs have suffered damages.

## TWELTH CAUSE OF ACTION
Violation of the NYSHRL – Retaliation
N.Y. Exec. Law § 296
(On Behalf of Plaintiff Kohn Against All Defendants and on Behalf of Plaintiffs Murphy and Sinatra Against Defendant Bassell )

470.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

471.    Plaintiffs Kohn, Murphy, and Sinatra opposed Defendants' sexual harassment and other forms of discrimination against individuals on the basis of their sex.

472.    Defendants retaliated against Plaintiffs Kohn, Murphy, and Sinatra in the terms and conditions of their employment because of Plaintiffs' opposition to Defendants' sexual harassment and discrimination, in violation of the NYSHRL.

473.    As a result of Defendant's conduct, Plaintiffs have suffered damages.

## THIRTEENTH CAUSE OF ACTION
Violation of the New York Labor Law – Failure to Pay Wages
NYLL §§ 191, 198
(On Behalf of Plaintiffs Kohn, Murphy, and Remetz Against Defendant Bassell)

474.    Plaintiff realleges as if fully set forth herein the allegations contained in the preceding paragraphs.

475.    At all relevant times, Plaintiffs Kohn, Murphy, and Remetz were employed by Defendant DOE and Defendant Bassell served as their supervisor.

476.    Defendant Bassell directed Plaintiff Kohn to perform work between July

69

1, 2022, and August 28, 2022, which Plaintiff Kohn did.

477.    Defendant Bassell failed to pay Plaintiff Kohn for the work she performed between July 1, 2022, and August 28, 2022, in violation of the NYLL.

478.    Defendant Bassell directed Plaintiff Remetz to perform work outside of normal work hours in 2022, 2023, and 2024, as detailed in the allegations above, which Plaintiff Remetz did.

479.    Defendant Bassell failed to pay Plaintiff Remetz for the work she performed outside of normal work hours in 2022, 2023, and 2024, as detailed in the allegations above, in violation of the NYLL.

480.    Because of Defendant Bassell's incessant harassment, Plaintiff Murphy forwent her lunch breaks nearly every day for three years, in violation of the NYLL.

### FOURTEENTH CAUSE OF ACTION
Negligent Supervision
(On Behalf of Plaintiff Leal Against Defendant DOE)

481.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

482.    Defendant DOE had a duty of care for the health, safety, and well-being of children in its care.

483.    Because Plaintiff Leal was under Defendant DOE's care, supervision, and control, Defendants had a special relationship with Plaintiff Leal and owed her a duty of adequate supervision when she was a student.

484.    Defendant DOE had a duty to use the highest degree of care in supervising children under its care, including Plaintiff Leal.

485.    Defendant DOE breached its duty by its negligent retention and

70

supervision of Defendant Bassell, and its repeated placement of Plaintiff Leal into Defendant Bassell's care.

486.    The sexual abuse Plaintiff Leal suffered was a reasonably foreseeable result of Defendant DOE's breach of its duties.

487.    By failing to protect Plaintiff Leal from abuse, Defendant DOE failed to exercise reasonable care in supervising her.

488.    Defendant DOE, its officers, agents, servants, and employees are responsible for Plaintiff Leal's injuries as a result of the breach of their duties.

489.    As a result of Defendants' conduct, Plaintiff Leal has suffered damages.

490.    This action is timely pursuant to NY CPLR § 208(b) because the action alleges intentional and negligent acts or omissions and claims injury suffered as a result of conduct which would constitute a sexual offense under NYPL § 130.52 (Forcible Touching) and NYPL § 130.55 (Sexual Abuse in the Third Degree), and Plaintiff was less than eighteen years old when such conduct was committed against her.

## FIFTHTEENTH CAUSE OF ACTION
### Negligent Training
### (On Behalf of Plaintiff Leal Against Defendant DOE)

491.    Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

492.    Defendant DOE had a duty to use the highest degree of care in supervising the children, including Ms. Leal, under its care.

493.    Defendant DOE was aware that DOE staff members had previously sexually abused students under the care of Defendant.

494.    Despite having this knowledge, Defendant DOE failed to properly train

71

and/or educate its staff members on how to avoid putting students into situations which could lead to them being sexually abused.

495.    Defendant DOE failed to properly train and/or educate its staff members on how to recognize signs of sexual abuse.

496.    Defendant DOE failed to properly train and/or educate its staff members on how to report instances of suspected sexual abuse.

497.    Because Defendant DOE did not properly train and/or educate on these topics, no DOE staff member reported Defendant Bassell's inappropriate conduct towards Ms. Leal prior to her reporting the assault.

498.    Had Defendant DOE properly trained its employees on these topics, DOE employees would have identified that Defendant Bassell was grooming Plaintiff Leal for sexual abuse before he had the chance to assault Ms. Leal.

499.    The sexual abuse Ms. Leal suffered was a reasonably foreseeable result of Defendant DOE's breach of its duties.

500.    Defendant DOE is therefore liable for its negligent training of its staff members.

501.    As a result of Defendant's conduct, Plaintiffs have suffered damages.

502.    This action is timely pursuant to NY CPLR § 208(b) because the action alleges intentional and/or negligent acts or omissions and claims injury suffered as a result of conduct which would constitute a sexual offense under NYPL § 130.52 (Forcible Touching) and NYPL § 130.55 (Sexual Abuse in the Third Degree), and Plaintiff was less than eighteen years old when such conduct was committed against her.

## SIXTEENTH CAUSE OF ACTION
Assault

72

(On Behalf of Plaintiff Leal Against Defendant Bassell)

503.	Plaintiffs reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

504.	Defendant Bassell made bodily contact with Ms. Leal when he put his hand under her skirt and groped her inner thigh on February 13, 2015.

505.	Defendant Bassell's conduct was offensive and wrong given that Defendant Bassell was Ms. Leal's school principal, Ms. Leal was a minor, and Ms. Leal did not consent to his inappropriate contact.

506.	Defendant Bassell intended to make contact with Ms. Leal without her consent.

507.	This action is timely pursuant to the NY CPLR § 208(b) because the action alleges intentional and/or negligent acts or omissions and claims injury suffered as a result of conduct which would constitute a sexual offense under NYPL § 130.52 (Forcible Touching) and NYPL § 130.55 (Sexual Abuse in the Third Degree), and Plaintiff was less than eighteen years old when such conduct was committed against her.

## JURY DEMAND

Plaintiffs demand a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully request judgment against Defendants as follows:

A. An injunction preventing Bassell from sexually harassing his employees in the workplace;

B. An injunction preventing Bassell from sexually abusing students who attend DOE-operated schools;

73

C.  An injunction requiring the DOE to train all its employees on its anti-retaliation

policies and whistleblower protections;

D.  Compensatory damages in an amount to be determined at trial;

E.  Punitive damages in an amount to be determined at trial;

F.  Reasonable attorneys' fees, costs and disbursements under, *inter alia*, 42 U.S.C. §

1988(b) and N.Y.C. Admin. Code §§ 10-1104(c) and 8-502(g); and

G.  Such other and further relief as this Court deems just and equitable.


Dated:        New York, NY
              April 8, 2026

                                        **GISKAN SOLOTAROFF & ANDERSON LLP**


                            By:     */s/ Amy E. Robinson*
                                    Amy E. Robinson
                                    Symone Yancey
                                    arobinson@gslawny.com
                                    syancey@gslawny.com
                                    (646) 964-9609
                                    1 Rockefeller Plaza, 8th Floor
                                    New York, NY 10020

                                    *Attorneys for Plaintiffs*

74